# United States Court of Appeals
## For the First Circuit

No. 17-1223

PREP TOURS, INC.,

Plaintiff-Appellant,

v.

AMERICAN YOUTH SOCCER ORGANIZATION; DOWNEY AYSO REGION 24;
ARMANDO RODRÍGUEZ, in his capacity as Director and/or Officer
and/or member of the Board of Directors of Downey AYSO Region
24; RAMÓN AGUILAR, in his capacity as Director and/or Officer
and/or member of the Board of Directors of Downey AYSO Region
24; CARL JACKSON, in his capacity as Director and/or Officer
and/or member of the Board of Directors of Downey AYSO Region
24; ALICIA RAMÍREZ, in her capacity as Director and/or Officer
and/or member of the Board of Directors of Downey AYSO Region
24; JOHN DOE; RICHARD DOE; BOB DOE;
INSURANCE COMPANY A; INSURANCE COMPANY B,

Defendants-Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Pedro A. Delgado-Hernández, U.S. District Judge]

Before

Torruella, Lipez, and Barron,
Circuit Judges.

Steven J. Torres, with whom Brooks L. Glahn, Torres Scammon
Hincks & Day LLP, Darío Rivera-Carrasquillo, Giancarlo Font, and
Rivera-Carrasquillo, Martínez & Font were on brief, for appellant.
Alan P. Dagen, with whom The Law Offices of Seda & Alan P.
Dagen, P.A., Luis A. Oliver-Fraticelli, and Adsuar Muñiz Goyco

Pérez-Ochoa, P.S.C. were on brief, for appellees.

January 8, 2019

**BARRON**, **Circuit Judge**.  This appeal raises a now familiar issue: when do remote communications by email and telephone give rise to the kind of connection to a forum state or territory that justifies the exercise of personal jurisdiction in that forum over an out-of-forum defendant?  The issue comes to us in this case via the diversity suit in the United States District of Puerto Rico that a Puerto Rico tour company brought against a California youth soccer organization and related defendants.  The tour company alleges in this suit that the defendants, by first requesting that the tour company make an offer for a potential soccer trip to Puerto Rico for some of the organization's teams and their families but then declining after further communications to book the tour, breached duties that the organization owed to it under Puerto Rico contract and tort law.  In response to the defendants' motion, the District Court dismissed both the contract and tort claims for lack of personal jurisdiction.  We now affirm that order.

## I.

American Youth Soccer Organization ("AYSO") is a nonprofit entity incorporated and headquartered in California.[1]

---

[1] "We derive our recitation of the case's facts from [the plaintiff's] properly documented evidentiary proffers and from those portions of the defendants' proffers that are undisputed." Copia Commc'ns, LLC v. Amresorts, LP, 812 F.3d 1, 2 (1st Cir. 2016).

The other defendants are Downey AYSO Region 24 ("Region 24") and four volunteers for Region 24.

Region 24 is a regional chapter of AYSO from Downey, California. Region 24 is not a separate legal entity from AYSO.

The four Region 24 volunteers served at all relevant times as, respectively, Region 24's commissioner (Armando Rodríguez), assistant commissioner (Ramón Aguilar), treasurer (Carl Jackson), and volunteer coordinator (Alicia Ramírez). All four individuals are residents of California.

PREP TOURS, Inc. ("PREP Tours") is the plaintiff.[2] It is a Puerto Rico corporation that, according to the complaint, "specializes in student cultural immersion educational field trips" and is "dedicated to servicing and organizing educational soccer tours for student athletes and soccer clubs focusing on friendly soccer games in Puerto Rico."

On Friday, November 2, 2012, Ramírez emailed PREP Tours from California to ask for a price quote and for what the company could "offer" regarding an all-inclusive trip to Puerto Rico for "[a]pproximately 60 players and their families." Ramírez informed the tour company in that email that Region 24 was also gathering

_____

[2] The covers of PREP Tours's briefs list additional plaintiffs, but neither the complaint nor the District Court's judgment identifies any additional plaintiff other than PREP Tours. And the notice of appeal specifies only PREP Tours as the party taking this appeal. See Rosario-Torres v. Hernandez-Colon, 889 F.2d 314, 316-17 (1st Cir. 1989).

- 4 -

information about alternative destinations, like Hawaii and Mexico.

PREP Tours responded that very same Friday by sending via email a promotional brochure regarding the "unique soccer program" in the Puerto Rico cities of San Juan and Rincón that it offered visiting youth soccer teams. The tour company also emailed Ramírez, after the weekend, a proposed itinerary based on the San Juan and Rincón tour described in the brochure, which PREP Tours described as "a tentative rough draft." There followed, intermittently over the next four months, emails and telephone calls, as well as at least one text message, between the parties concerning the possible trip. During these ensuing communications, Ramírez informed PREP Tours that Region 24 was considering competing offers on a possible trip to Puerto Rico from three alternative travel agencies, at least one of which was not based in Puerto Rico.

Before Region 24 made a decision about the trip, a travel agency in Florida, Hakuna Matata Group Tours, LLC, contacted Ramírez by email concerning possible flights. The complaint says that Hakuna Matata was "designated by PREP Tours" to handle the soccer teams' flight arrangements.

Hakuna Matata later emailed Ramírez with information for wiring it money as a deposit on the airline flights. Region 24's treasurer, Jackson, thereafter emailed Hakuna Matata to say that

he could wire transfer the money to Hakuna Matata's account the next day, January 25.

Jackson did not wire the money. Ramírez did write PREP Tours on January 25, however, to say that the commissioner, assistant commissioner, and treasurer of Region 24 still had "to go through everything with a fine tooth-comb."

The record references no further communications between any of the parties until the ones that were made on February 25, 2013. On that day, PREP Tours emailed Region 24's commissioner, assistant commissioner, and treasurer to follow up on the status of its offer.

The commissioner, Rodríguez, responded that same day with an email telling PREP Tours that the assistant commissioner, Aguilar, was "still working on logistics." He then sent a later email that instructed PREP Tours to disregard this first email. Aguilar had responded in the interim by informing PREP Tours that "[a]fter reviewing all proposals from the 3 compan[ies] we decided to go with a local company."

Just short of two years later, PREP Tours sued AYSO, Region 24, and the four volunteers in the United States District Court for the District of Puerto Rico, seeking a minimum of $640,000 in damages. The complaint alleged that the defendants were liable under the Puerto Rico tort doctrine of culpa in contrahendo, "which requires parties to negotiate in good faith."

<u>Ysiem Corp.</u> v. <u>Commercial Net Lease Realty, Inc.</u>, 328 F.3d 20, 23 (1st Cir. 2003) (citation omitted).  The complaint also alleged a breach-of-contract claim under Puerto Rico law.  The complaint asserted that the contract was created by: (1) the email from Region 24's treasurer to Hakuna Matata in Florida, saying that he could wire money to that third-party travel agency in order to make a deposit on the airline flights; and (2) other "representations" made by the defendants.  The complaint did not allege what the contract's terms were, but it did allege that the defendants were in breach of the contract.

The defendants moved to dismiss PREP Tours's claims under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, and the defendants submitted affidavits with their motion.  An affidavit from AYSO's deputy executive director as well as affidavits from the individual defendants each averred that the "only contacts" that existed between the defendants and PREP Tours consisted of "the preliminary communications between some of [the Region 24] volunteers and the travel agency with whom they communicated in an effort to obtain pricing and information for a potential trip for some of [Region 24's] youth soccer teams."

PREP Tours's brief in opposition to the defendants' motion to dismiss included a number of evidentiary submissions attached as exhibits.  The submissions included copies of the

communications exchanged between the parties during the relevant four-month period.

Neither party requested an evidentiary hearing following the defendants' motion challenging personal jurisdiction, nor did the District Court conduct one. The District Court instead used what we have referred to as "the prima facie standard" to assess whether PREP Tours had met its burden to justify the exercise of personal jurisdiction in Puerto Rico over the defendants. Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675-76 (1st Cir. 1992) (emphasis omitted); see also A Corp. v. All Am. Plumbing, Inc., 812 F.3d 54, 58 (1st Cir. 2016) (explaining that the plaintiff bears the burden to establish that personal jurisdiction exists over the defendant).

Under this standard, a district court "consider[s] only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." Boit, 967 F.2d at 675. "To make a prima facie showing of this calib[er], the plaintiff ordinarily cannot rest upon the pleadings, but is obliged to adduce evidence of specific facts." Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995) (citing Boit, 967 F.2d at 675).

In July of 2016, the District Court granted the defendants' motion to dismiss PREP Tours's claims without prejudice for lack of personal jurisdiction. The District Court

- 8 -

reasoned that, although the defendants reached out to PREP Tours regarding the trip, they "repeatedly communicated to [PREP Tours] that officials had not made a final decision in regards to the trip" and that the "unilateral" actions undertaken by PREP Tours in Puerto Rico in response were insufficient to establish personal jurisdiction over the defendants as to any of PREP Tours's claims.

PREP Tours now appeals. Our review of the District Court's judgment is de novo. See Boit, 967 F.2d at 675. "Reviewing a decision made under the prima facie standard, we must accept [the plaintiff's] properly documented evidentiary proffers as true and construe them in the light most favorable to [the plaintiff's] jurisdictional claim." A Corp., 812 F.3d at 58 (citing Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008)). "But we will also consider facts offered by [the defendants], to the extent that they are not disputed." Id. (citing Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 51 (1st Cir. 2002)).

## II.

PREP Tours conceded below, as it must, that the District Court lacks general jurisdiction over the defendants because the defendants do not have "continuous and systematic" contacts with Puerto Rico. Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011). PREP Tours nevertheless contends that the District Court erred in dismissing its claims because the District

- 9 -

Court does have "specific or case-linked" jurisdiction over the defendants as to both of its claims.  Id.  Jurisdiction on this basis "depends on an affiliatio[n] between the forum and the . . . controversy" underlying the plaintiff's claims.  Id. (alteration in original) (internal quotation marks omitted).

"When . . . the lens of judicial inquiry narrows to focus on specific jurisdiction . . . . the applicable constitutional limits assume critical importance."  Foster-Miller, 46 F.3d at 144.  Those limits, arising from the Due Process Clause of the Fourteenth Amendment to the United States Constitution, permit a court to exercise jurisdiction over an out-of-forum defendant only if, with respect to the claims at issue, the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).[3]

---

[3] "The requirements of International Shoe . . . must be met as to each defendant over whom a state court exercises jurisdiction."  Rush v. Savchuk, 444 U.S. 320, 332 (1980).  The parties dispute whether, under the facts of this case, we may attribute the various defendants' combined forum contacts to each individual defendant for the purposes of the personal jurisdiction analysis.  Because even the combined forum contacts are constitutionally insufficient, however, we need not decide who is right.

To determine whether the exercise of specific jurisdiction in the forum over an out-of-forum defendant conforms to that federal constitutional test, three requirements must be met:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must . . . be reasonable.

United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1089 (1st Cir. 1992).

This inquiry is highly "fact-specific." Id. As the Supreme Court has explained, the constitutional test is "not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present." Kulko v. Superior Court of Cal., 436 U.S. 84, 92 (1978) (quoting Hanson v. Denckla, 357 U.S. 235, 246 (1958)). Moreover, "this determination is one in which few answers will be written 'in black and white. The greys are dominant and even among them the shades are innumerable.'" Id. (quoting Estin v. Estin, 334 U.S. 541, 545 (1948)).

- 11 -

We begin with the requirement that PREP Tours's claims must relate to the defendants' contacts with Puerto Rico. This "flexible, relaxed standard" for assessing relatedness requires that there be only a "demonstrable nexus" between the complaint's claims and the activities in the forum that properly may be attributed to the defendants, such that "the litigation itself is founded directly on those activities." Adelson v. Hananel, 652 F.3d 75, 81 (1st Cir. 2011) (quoting N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 25 (1st Cir. 2005); Hannon v. Beard, 524 F.3d 275, 279-80 (1st Cir. 2008)).

PREP Tours contends that, as to each of its claims, the defendants' "related" forum contacts are the defendants' remote communications with the Puerto Rico-based tour company during the four-month period beginning with Ramírez's initial inquiry email and the activities that PREP Tours undertook from Puerto Rico during those four months in response to those communications.[4] PREP Tours contends that its tort claim alleging that the defendants negotiated in bad faith arises from the defendants'

---

[4] PREP Tours does point out that the AYSO teams eventually traveled to Puerto Rico in July of 2013. But, this trip occurred several months after the communications between the parties from which PREP Tours asserts that their claims arise, and PREP Tours makes no argument that their claims also arise from this trip. See Carreras v. PMG Collins, LLC, 660 F.3d 549, 554 (1st Cir. 2011).

contacts with Puerto Rico because it was through the defendants' remote communications with the tour company that the defendants acted in bad faith, resulting in harm to the tour company in Puerto Rico in consequence of, at least in part, the activities that PREP Tours undertook in Puerto Rico in response to those communications. PREP Tours contends that its breach-of-contract claim arises from these same set of contacts, as the remote communications between the parties and the actions that the tour company undertook in response to them provide the basis for the claim that the defendants reached into Puerto Rico to enter into the alleged contract and then breached it.  See Daynard, 290 F.3d at 52 (explaining that, with respect to a breach-of-contract claim, we focus on "the parties' 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing'" (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479 (1985))).

The defendants counter that PREP Tours's claims do not in fact arise from their remote communications with the tour company or the activities in Puerto Rico that PREP Tours claims to have taken in response to those communications.  The defendants contend that their conduct that allegedly breached both their duty to negotiate in good faith and their alleged contract with PREP Tours was their decision to book the trip through a different company, which was a decision that they made outside of Puerto

- 13 -

Rico.   Moreover, as far as the breach-of-contract claim is concerned, the defendants point out that the complaint's only non-conclusory allegation that a contract existed between the parties is based on an email that was sent by Region 24's treasurer in California to a travel agency, Hakuna Matata, that is located in Florida and that has no connection to Puerto Rico.

The District Court agreed with PREP Tours that the relatedness requirement for case-linked jurisdiction is met as to both the tort and contract claims, but we need not decide whether the District Court was right.   Even if the defendants' remote communications with PREP Tours and PREP Tours's activities in Puerto Rico in response relate to PREP Tours's claims, PREP Tours must also show that the defendants purposefully availed themselves of the privilege of conducting activities in Puerto Rico through these contacts.   See United Elec., 960 F.2d at 1089.   And, as we next explain, the District Court rightly concluded that PREP Tours failed to do so.   Accordingly, we turn to the purposeful availment inquiry, assuming that the contacts that PREP Tours identifies as being related to its claims are in fact related to them.[5]

---

[5] Given this conclusion, we also do not need to reach the reasonableness requirement of the due process analysis.   Nor do we need to reach the issue of whether personal jurisdiction is permitted under Puerto Rico's long-arm statute.   See Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir. 1994) (explaining that, in order to assert specific jurisdiction over an out-of-forum defendant, a federal court sitting in diversity "must find

- 14 -

To explain why we agree with the District Court that PREP Tours has not satisfied the purposeful availment requirement as to any of its claims, we first need to describe that requirement in more detail. With that legal background in place, we then can explain why we conclude that PREP Tours, on this record, fails to make the requisite showing.

**A.**

To show that the defendants purposefully availed themselves of the privilege of conducting activities in the forum, PREP Tours must demonstrate that the defendants established a "substantial connection" with Puerto Rico. Burger King, 471 U.S. at 475 (quoting McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957)). Put otherwise, PREP Tours must point to "some act by which the defendant[s] purposefully avail[ed] [them]sel[ves] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Id. (quoting Hanson, 357 U.S. at 253).

By requiring the plaintiff to establish such a substantial connection between the out-of-forum defendant and the forum, we ensure that it is "fair to require defense of the action in the forum." Kulko, 436 U.S. at 91 (citing Milliken, 311 U.S.

---

contacts that, in the aggregate, satisfy the requirements of both the forum state's long-arm statute and the Fourteenth Amendment").

at 463-64). The purposeful availment requirement in this way "represents a rough quid pro quo: when a defendant deliberately targets its behavior toward the society or economy of a particular forum, the forum should have the power to subject the defendant to judgment regarding that behavior." Carreras, 660 F.3d at 555 (citing J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 879 (2011) (plurality op.)).

The flip side of this deal, however, is that when the out-of-forum defendant has not "manifestly . . . availed himself of the privilege of conducting business there," it would be "unreasonable to require [the defendant] to submit to the burdens of litigation in that forum[.]" Burger King, 471 U.S. at 476. And, in accord with this understanding of the purposeful availment requirement, we have explained that "the two cornerstones of purposeful availment" are "voluntariness" and "foreseeability." Ticketmaster-N.Y., 26 F.3d at 207.

"Voluntariness requires that the defendant's contacts with the forum state 'proximately result from actions by the defendant himself.'" Phillips, 530 F.3d at 28 (quoting Burger King, 471 U.S. at 475). Accordingly, the Supreme Court has explained that any contacts that cannot be attributed "proximately" to the defendant's own activities constitute "unilateral" activity that cannot establish purposeful availment. See Burger King, 471 U.S. at 475.

- 16 -

In addition, the Supreme Court has described the "benchmark" for purposeful availment in terms of a particular "kind of foreseeability."  Id. at 474 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295 (1980)); see also Donatelli v. Nat'l Hockey League, 893 F.2d 459, 464 (1st Cir. 1990) (discussing the Court's introduction of this "explicit 'foreseeability' element into the liturgy of minimum contacts").  Specifically, the Supreme Court has explained that "the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."  Burger King, 471 U.S. at 474 (quoting World-Wide Volkswagen, 444 U.S. at 297).  For this reason, too, a plaintiff's "unilateral activity" cannot establish the requisite connection between the defendants and the forum jurisdiction.  Id. at 474-75 (quoting Hanson, 357 U.S. at 253).

There is good reason to focus on whether out-of-forum defendants could foresee being haled into a court in the forum from the connection that they are said to have with the forum. Such a focus for the inquiry "gives a degree of predictability to the legal system" because it "allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." World-Wide Volkswagen, 444 U.S. at 297.

Notably, the fact that a defendant directly contacted the plaintiff in the forum only remotely by Internet or telephone, as allegedly happened here, does not preclude the defendant from having the substantial connection to the forum that is necessary to satisfy the purposeful availment requirement. See Burger King, 471 U.S. at 476. Such remote communications are often the primary means by which business relationships are forged and conducted. See id.

But, as the Supreme Court has noted, the application of the rule prohibiting a plaintiff's unilateral activity from establishing the requisite foreseeable substantial connection between the defendant and the forum "will vary with the quality and nature of the defendant's activity." Id. at 474-75 (quoting Hanson, 357 U.S. at 253). Thus, the fact that the communications occurred remotely may well be relevant to the inquiry. And, to that very point, we have recently observed that three factors have been the "hing[e]" in our past assessment of purposeful availment in cases in which remote communications supplied the predicate for the contacts that ground specific or case-linked personal jurisdiction over an out-of-forum defendant: "the defendant's in-forum solicitation of the plaintiff's services, the defendant's anticipation of the plaintiff's in-forum services, and the plaintiff's actual performance of extensive in-forum services." Copia, 812 F.3d at 6 (emphasis added) (describing the factors from

C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59 (1st Cir. 2014), and Cossart v. United Excel Corp., 804 F.3d 13 (1st Cir. 2015)).

**B.**

Against this background, we now must assess whether the showing that PREP Tours has made regarding both the nature and quality of the defendants' activities and the activities that PREP Tours engaged in that relate to the contract and tort claims at issue satisfies the purposeful availment requirement. PREP Tours relies on the three factors identified in Copia in asserting that its showing as to these activities does suffice. And so we need to address what PREP Tours has to say about how these activities relate to each of these factors.[6]

--------

[6] The dissent suggests that it is focusing only on the plaintiff's tort claim because it "reveals so clearly the error in the majority's purposeful availment analysis and unfairness of the outcome." See Diss. Op. 44 n.27. But, we do not see how the distinction between the tort claim and the contract claim matters to the purposeful availment inquiry, or how the focus on the tort claim reveals any unfairness with respect to the lack of personal jurisdiction over the defendant in Puerto Rico that would not be equally evident if we focused on the contract claim. After all, while the dissent cites to much precedent explicating Puerto Rico tort law, the purposeful availment test does not derive its content from local law. It derives its content from the requirements of a federal constitutional protection. And Copia holds that this protection requires a showing that the out-of-forum defendant, through voluntary contacts making the forum's assertion of jurisdiction over him foreseeable, has established a greater tie to that forum than was determined to be present there. See 812 F.3d at 6. Nothing in the way that Puerto Rico has chosen to define the elements of this tort claim, therefore, can permit us

PREP Tours does point to aspects of the record that bear on each one of these three factors.  As to solicitation, we agree with PREP Tours that the record shows that one of the Region 24 volunteers, Ramírez, voluntarily reached out (remotely) from

_____

to conclude that a lesser tie than was present in Copia may suffice to satisfy the federal constitutional minimum that we discerned in that case.  And the dissent cites no case indicating to the contrary.

Of course, in some cases, the defendant's contacts with the forum jurisdiction that are related to a plaintiff's tort claim might differ from those related to its contract claim, such that the purposeful availment inquiry with respect to each claim might require an assessment of distinct contacts.  See Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 288-89 (1st Cir. 1999) (explaining that the relatedness inquiry is done "on a claim-by-claim basis" because it depends on the nexus between the alleged in-forum contacts and the "elements of the cause of action").  In Copia, for example, because the plaintiffs pressed a contract claim, we only considered the defendants' "relevant, i.e., contract-related, dealings with" the plaintiff for the purposeful availment analysis.  812 F.3d at 5.  But, as we have explained, see supra p.14, and as the dissent acknowledges, see Diss. Op. 44 n.27, we are proceeding on the assumption in this case that the contract and tort claims arise from the same alleged "activity or . . . occurrence[] . . . in the forum State," Goodyear, 564 U.S. at 919, and thus we consider precisely the same set of contacts as to both claims.  Accordingly, our purposeful availment analysis is precisely the same as to both claims, nor does the plaintiff ask us to proceed otherwise.

Thus, we must decide whether those contacts suffice to establish a more substantial connection between the defendants and the forum here than Copia found to be present there.  In doing so, however, we do not thereby purport to address the merits of either the contract or the tort claim, as our inquiry concerns only the legal propriety of making Puerto Rico the forum jurisdiction for the claims.  And, with respect to that inquiry, the "fairness" concern that matters relates not to how Puerto Rico defines its tort law, but to how the relevant precedents construe the Due Process Clause to define purposeful availment.

California to PREP Tours in Puerto Rico in order to ask for a price quote and for what the company could "offer" as a proposed trip for roughly sixty soccer players and their families. We can also agree that the defendants should have reasonably anticipated that some action would be undertaken by PREP Tours in Puerto Rico in response to that inquiry -- such as replying with a proposed itinerary -- given that the defendants knew that PREP Tours was located there. And, finally, we can see no reason to doubt that some foreseeable action was then actually undertaken by PREP Tours in Puerto Rico.

But, even granting all that, as we will next explain, the factors that we identified in <u>Copia</u> are not present here "to remotely the same degree" as they were in our other cases on which PREP Tours relies in arguing that the purposeful availment requirement is met. <u>Copia</u>, 812 F.3d at 6. And, in light of that fact and our review of the relevant contacts as a whole, we conclude, as we did in <u>Copia</u> itself, that the in-forum plaintiff did not meet its burden to satisfy the purposeful availment requirement as to any of its claims.[7]

---

[7] In arguing that the purposeful availment requirement is satisfied, PREP Tours asserts on appeal that the parties had forged a contract because the defendants ultimately "agreed on a final itinerary and cost . . . and agreed to proceed with the trip that PREP Tours had planned at the Defendants' request." But, in making that conclusory assertion on appeal, PREP Tours does not develop any challenge to the District Court's ruling below in which the

**1.**

We start by considering the showing that PREP Tours made regarding the nature and quality of the defendants' activities in the forum as they relate to the Copia factors.  Those in-forum defendant activities consist exclusively of the defendants' remote communications with PREP Tours concerning the trip.

---

District Court rejected PREP Tours's contention that the Region 24 treasurer's email with a third party -- Hakuna Matata -- could show that a contract existed between PREP Tours and the defendants. Nor does PREP Tours point on appeal to any non-conclusory allegation in the complaint (or the record) showing that a contract did exist between the parties.  See Soto-Torres v. Fraticelli, 654 F.3d 153, 156 (1st Cir. 2011).

Moreover, PREP Tours also does not develop any argument about how the alleged contract bears on the purposeful availment inquiry as to the assertion of personal jurisdiction with respect to either the contract or tort claims.  For example, PREP Tours does not argue to us -- and did not argue below -- that purposeful availment exists due to services that the tour company would foreseeably provide in the forum under the contract, or due to any other "contemplated future consequences" under the contract.  Daynard, 290 F.3d at 52 (quoting Burger King, 471 U.S. at 479).  In fact, PREP Tours nowhere alleges -- either below or on appeal -- what the terms of the purported contract even were.  We have repeatedly made clear, however, that an out-of-forum party's contract with an in-forum party is not in and of itself sufficient to establish personal jurisdiction over the out-of-forum party, even where the plaintiff's claims include non-contract claims.  See United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 621 (1st Cir. 2001) (quoting Ganis Corp. of Cal. v. Jackson, 822 F.2d 194, 197-98 (1st Cir. 1987)).  Thus, PREP Tours's failure to develop any such argument on appeal is problematic, insofar as PREP Tours means to contend that the alleged contract alone enables PREP Tours to satisfy the purposeful availment requirement for its claims even if the other contacts with Puerto Rico that it attributes to the defendants (and which the analysis that follows addresses) otherwise would not suffice.

The communications began, the evidentiary submissions show, when one of the Region 24 volunteers, Ramírez, asked PREP Tours via email from California for a price quote and for what the company could "offer" regarding a potential trip by some of Region 24's teams to Puerto Rico. The evidentiary submissions also show that this same volunteer later asked via electronic means from California that PREP Tours modify the offer that she had earlier requested in light of new specifications that she gave regarding that potential trip.

We cannot reasonably infer, however, from these communications alone that the defendants (a number of whom had no contact directly with PREP Tours at all),[8] or even Ramírez in particular, believed themselves to be asking for the type of information that would require a self-described "speciali[st]" in such trips to engage in extensive trip-planning activities in the forum prior to an agreement being reached with the "speciali[st]." Nor can we reasonably infer from these communications alone that the purposeful availment requirement is met on the ground that they show that the defendants were contemplating the kind of

---

[8] As far as the evidentiary submissions indicate, over the course of the relevant four-month period, the two entity defendants, AYSO and Region 24, had no direct communications with PREP Tours. Nor did Region 24's treasurer, Jackson. Region 24's commissioner (Rodríguez) and assistant commissioner (Aguilar), moreover, together sent only three emails to PREP Tours, all on the same day, solely to apprise PREP Tours of the status of its offer in response to PREP Tours's own query.

ongoing and close-working relationship with PREP Tours that could establish the requisite substantial connection between the defendants and the forum. See Cossart, 804 F.3d at 21; C.W. Downer, 771 F.3d at 67.

Ramírez made clear in her initial inquiry email to PREP Tours that no decision had even been made for the soccer teams to go to Puerto Rico, as the email expressly stated that Region 24 was also gathering information about alternative destinations, like Hawaii and Mexico. And, in her email replying to PREP Tours's response to that initial inquiry, Ramírez noted that "[a]s soon as [Region 24's] decision is made, I will let you know," thereby reinforcing the preliminary nature of her inquiry and diminishing the foreseeability of PREP Tours undertaking extensive in-forum activities in response or the parties having an ongoing and close-working relationship.

PREP Tours's complaint does assert that PREP Tours "continuously receiv[ed] requests by e-mail and telephone calls" from Ramírez "to amend different areas of the proposal in order to accommodate the needs of the group" and that these requests resulted in "multiple requirements" with which PREP Tours's offer had to comply.[9] But, while communications of that type certainly

_____

[9] The complaint alleges that requests were also received "later on" from the Region 24 treasurer, Jackson. However, the only communication by Jackson that PREP Tours's papers reference was his email to the third-party travel agency located in Florida.

do bear on the Copia factors of solicitation and anticipation, the properly documented communications call into question PREP Tours's characterization of the nature of these communications. Instead, the record shows only the following.

Ramírez asked by email for PREP Tours to "tweak" -- her wording in the email -- the "tentative rough draft" itinerary that PREP Tours had initially sent, which resulted in what PREP Tours described in an email to Ramírez as a "new itinerary almost identical to the original itinerary that we first sent you."[10] Ramírez did so, moreover, while also informing PREP Tours that Region 24 was contacting three alternative travel agencies for competing offers on the possible trip to Puerto Rico.

The evidentiary submissions also show that Ramírez later sent an email asking whether PREP Tours could accommodate specific dates for a possible trip that incorporated the prior "tweak" along

_____

[10] The requested "tweak" was to include all-inclusive hotels, two to three matches per team, two to three excursions, free time for families, and a cost of about $2,000 per person. PREP Tours rejected the request for all-inclusive hotels, explaining that it would not be cost-effective. Thus, PREP Tours stuck with hotels that it had already identified when it sent the original itinerary to Ramírez. The revised itinerary also did not list any additional local teams that would participate in the friendly soccer matches. Finally, the revised itinerary removed some activities that PREP Tours had originally proposed while adding some additional activities that Ramírez's email had not requested (such as a tour of a Bacardi rum plant). These changes reduced the estimated price range from $1,495-$1,595 to $1,275-$1,375 per person without airfare.

- 25 -

with arguably some minimal changes to it.[11]  But, Ramírez stated in that email once again that Region 24 had not yet decided on a travel agency, though she did at that point state (for the first time) that the trip would be to Puerto Rico.

Finally, the record shows that, following this email from Ramírez, PREP Tours sent her a revised itinerary reflecting minimal changes and pushed Ramírez for more details about the number of persons who might be on the trip.  And, as the record shows, Ramírez thereafter sent PREP Tours a one-line email attaching a document listing a "breakdown of our team going to Puerto Rico," which consisted of some seventy names of players and coaches.[12]

But, in sending along that partial list of potential travelers, Ramírez was responding to a request for information from PREP Tours.  That is, Ramírez provided the partial list in response to a unilateral act by PREP Tours.  Furthermore, in providing that response, Ramírez did not state that Region 24 had

_____

[11] Ramírez inquired about specific dates for a ten-day trip that -- roughly consistent with the earlier "tweak" she had already requested that had resulted in the "almost identical" revised itinerary -- would consist of only three matches per team, include free time, and cost no more than $2,000.  The itinerary she received back from PREP Tours a week later removed or rendered "optional" some of the activities.  The estimated price was $1,995 per adult and $1,695 per child with airfare.

[12] Although the attached "breakdown" listed the names of only some seventy players and coaches, it indicated that 252 people would be on the trip.

- 26 -

made a decision to book the trip through PREP Tours, nor did she make any request of PREP Tours to take any actions in light of the list that she had sent. In fact, in her last email to PREP Tours in the record, Ramírez communicated that Region 24's officers still had "to go through everything with a fine tooth-comb."

Thus, as the District Court emphasized, PREP Tours's own evidentiary submissions show that, in the few substantive inquiry emails from Ramírez to PREP Tours -- out of what the defendants say, without any challenge by PREP Tours, is "a sum total of nine" emails from her -- she consistently communicated the preliminary and limited nature of her inquiry.[13] And, given that the nature and quality of the defendants' solicitation of in-forum activity was preliminary and limited, the defendants' own forum-related activity is a far cry from that of the defendants in C.W. Downer and Cossart, which are among the chief precedents of ours on which PREP Tours relies.[14]

---

[13] Several, if not most, of the nine emails were sent in response to emails from PREP Tours itself simply in order to acknowledge the receipt of PREP Tours's messages. And, in the substantive emails among these nine, Ramírez referred to her "delays" in responding to PREP Tours's "quote," further indicating the intermittent nature of her communications.

[14] We agree with the dissent that negotiations "preliminary" to a formal agreement are the foundation of a bad-faith tort claim. See Diss. Op. 53. But, we highlight the preliminary nature of the parties' negotiations with respect to our analysis of purposeful availment as to both the tort and contract claims. And we do so not to cast doubt on the merits of either of those claims but instead because the preliminary nature of those contacts is

- 27 -

In C.W. Downer, for example, the out-of-forum defendant was a Canadian corporation that had engaged an investment bank located in Massachusetts to sell the corporation, which the investment bank then spent four years trying to do before the deal fell apart and the investment bank sued the corporation in Massachusetts.  771 F.3d at 67.  And, in Cossart, the out-of-forum defendant was a firm based in Kansas that had hired an employee located in Massachusetts to work for the firm, which the employee did for a "period of years" before suing the employer in Massachusetts for wage law violations.  804 F.3d at 18.

Of course, neither C.W. Downer nor Cossart purported to establish the minimum connection to the forum that must be shown to establish personal jurisdiction.  But, none of our other cases on which PREP Tours relies supports the proposition that an out-of-forum defendant would foresee being haled into court in that forum on the basis of having made the preliminary and limited type

directly relevant to the component of the purposeful availment inquiry that requires us to assess whether the in-forum actions that PREP Tours took in response to the defendants' contacts were "foreseeable" to the defendants or were instead "unilaterally" undertaken by the plaintiff itself.  Moreover, the preliminary nature of contacts is also directly relevant to PREP Tours's contention that the contacts show that the defendants contemplated an ongoing relationship with PREP Tours and that there was in fact such a relationship.  In this regard, our concern is not with whether the conduct alleged is tortious, but with whether that conduct is of a type that permits the forum to be the jurisdiction in which that determination is made.

of information requests to a forum-based service provider that were made here.[15]  Nor are we aware of any such supporting authority.

In fact, this case in some respects provides even less basis for finding the requisite "substantial connection" to the forum than did Copia, in which we found no purposeful availment. 812 F.3d at 5-6.  There, we rejected the contention that a Jamaica-based resort operator purposefully availed itself of the privilege of conducting activities in Massachusetts as a result of the negotiation and performance of a contract between the resort operator and a Massachusetts-based internet services provider. See id.  We did so even though the resort operator had voluntarily negotiated with the provider remotely, including via emails that the chief executive officer of the Massachusetts-based internet services provider "may have sent or received . . . while in

---

[15]  See, e.g., Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 36-40 (1st Cir. 2016) (finding purposeful availment where an out-of-forum franchisee twice renewed its contract with an in-forum franchisor, with which it had a multi-year business relationship and to which it mailed 180 royalty checks and delivered quarterly samples of its product); Adelson, 652 F.3d at 79, 82-83 (finding purposeful availment where an out-of-forum employee "directed regular administrative and financial conduct" toward his employer's offices in the forum during multiple years of employment, after he had sought out the employment contract); Daynard, 290 F.3d at 46, 61-62 (finding purposeful availment in part because of an out-of-forum law firm's "properly attributed" "ongoing relationship" with an in-forum lawyer who was allegedly "central" to the firm's "titanic recoveries" in a complex litigation).

Massachusetts" and via meetings in Jamaica.  Id. at 2-3.[16]  And, we did so even though, under the contract that the parties eventually concluded, in addition to providing certain services in Jamaica, the provider shipped equipment from Massachusetts to the resort operator in Jamaica.  Id. at 3.

We explained that the resort operator's anticipation of the "provi[sion of] equipment and services" by a party known to be in Massachusetts did not "represent[] the type of purposeful availment of the privilege of conducting business in Massachusetts that would have made it reasonably foreseeable that [the out-of-forum company] could be 'haled into court' in Massachusetts[.]" Id. at 6 (quoting Burger King, 471 U.S. at 486).[17]  And, in so concluding, we emphasized that there was "no evidence that the [resort operator] cared about the geographic origin of the

_____

[16] The district court's opinion in Copia, which reviewed the evidentiary record in detail, noted that the Chief Executive Officer of the Massachusetts-based internet services provider "received emails in the course of the negotiations (and later the relationship) some of which he may have read at Copia's principal place of business in Massachusetts."  Copia Commc'ns, LLC v. Amresorts, LP, No. 14-13056, 2015 WL 7621480, at *1 (D. Mass. Feb. 5, 2015).  And, as the District Court noted, the Chief Executive Officer represented that, "[o]n occasion, communications via telephone or e-mail were sent and received while [the Chief Executive Officer] was in Massachusetts."  Id. at *3.

[17] The resort operator knew that the internet services provider was based in Massachusetts because it "addressed payment to [the internet services provider's] Massachusetts address." Copia, 812 F.3d at 3.

shipments" of the equipment for which the resort operator had contracted.  Id. at 5.

PREP Tours does assert on appeal that Ramírez reached out to PREP Tours specifically because it could undertake "local efforts" in Puerto Rico (as opposed to, say, the fact that it specialized in soccer trips to that locale).  But, the tour company neither alleges such in its complaint nor points to any evidence in the record to support this assertion.  In fact, the record shows that Region 24 contacted multiple travel agencies, not all of which were located in Puerto Rico, and that Region 24 ultimately procured a California-based travel agency to book its trip to Puerto Rico.[18]

To be sure, as PREP Tours points out, one of the defendants, Ramírez, initiated the contact with the in-forum party, PREP Tours.  And that was not the case in Copia.  There, the in-forum plaintiff initiated the negotiations that we found insufficient to demonstrate purposeful availment there.  See id. at 6.  But, negotiations involving numerous contacts between the parties -- some made in the forum -- to secure an ongoing services relationship there did then ensue.  In that respect, we do not

---

[18] PREP Tours does suggest on appeal that the defendants procured this California-based company's services only after "misstat[ing] their intentions to PREP Tours to enable them to get the benefit of PREP Tours' local efforts."  But, that assertion does little to show purposeful availment on the defendants' part, as that inquiry still turns on whether the defendants anticipated that PREP Tours would undertake "local efforts."

think that the out-of-forum party in Copia had less substantial contacts over the course of the relationship with the in-forum party than the defendants did in this case.

Moreover, the Supreme Court made clear in Kulko that even where it is the out-of-forum defendant who voluntarily and knowingly establishes some contacts with the forum, specific jurisdiction over the defendant may still be lacking if the prospect of in-forum litigation was not foreseeable in light of the nature and quality of that contact with the forum. See 436 U.S. at 94, 97-98. And, given the preliminary and limited nature and quality of that initial inquiry to PREP Tours from Ramírez and of the defendants' other ensuing communications with the tour company, we conclude that this one feature of the case does not suffice to support the conclusion that the defendants' activities established a "substantial connection" between the defendants and the forum. Burger King, 471 U.S. at 475; cf. Sandstrom v. ChemLawn Corp., 904 F.2d 83, 89 (1st Cir. 1990) (holding that general jurisdiction was lacking over an out-of-forum defendant that was licensed to do business in the forum and had engaged in non-substantial advertising in the forum, and explaining that "preparations to do business at an indeterminate future date, without more, cannot be confused with actually doing business").

**2.**

PREP Tours contends, however, that, to assess purposeful availment, we must consider not only the defendants' own activities, as reflected in the defendants' remote communications with PREP Tours, but also the "extensive" activities that the tour company undertook in response. And we agree, consistent with Copia's recognition of the import of the factors of anticipation and performance.

But, we conclude, consideration of PREP Tours's own activities, even in combination with those undertaken by the defendants, does not require a different conclusion from the one that the District Court reached as to purposeful availment. And that is both because of what the record shows about the actual activities PREP Tours undertook and because those activities must be considered in light of the nature of the communications that the defendants made prior to PREP Tours having undertaken those activities. See Burger King, 471 U.S. at 474 ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." (quoting Hanson, 357 U.S. at 253)).

In its brief on appeal, PREP Tours asserts that, in responding to the defendants' inquiries regarding the possible trip, it foreseeably undertook "dozens of contacts" in the forum on the defendants' behalf that should be attributed to the

defendants for jurisdictional purposes. According to PREP Tours's brief, those contacts include "contacting Puerto Rico-based hotels, restaurants, soccer teams, business owners, and travel agents."

PREP Tours's complaint, however, does not allege that PREP Tours contacted a single other business, soccer team, or any person who did not work for PREP Tours in response to the defendants' inquiry.[19] See Doyle v. Hasbro, Inc., 103 F.3d 186, 190 (1st Cir. 1996) ("In conducting our review of the case, we are limited to those allegations contained in the amended complaint."). Nor did PREP Tours expressly rely below on any such contacts by the tour company in its argument to the District Court that there was personal jurisdiction over the defendants. Cf. McCoy v. Massachusetts Inst. of Technology, 950 F.2d 13, 22 (1st Cir. 1991) ("It is hornbook law that theories not raised squarely

---

[19] The dissent concludes that we may infer that "each new itinerary involved re-engaging with service providers to discuss new costs and timing (including booking hotels and flights)[.]" Diss. Op. 51. But, we do not see how we may make such an inference when the plaintiff's own complaint does not make any allegation that it engaged with any service providers in response to the defendants' requests, let alone any allegation that they re-engaged with them every time the defendants made a new request. The absence of such allegations from the complaint is especially conspicuous given that they concern the plaintiff's own conduct. See Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 639-40 (1st Cir. 2013) (upholding dismissal of claims where there was "no suggestion" that the "missing facts should be beyond [plaintiff's] reach" or that the plaintiff "lack[ed] the information needed to" allege such facts).

in the district court cannot be surfaced for the first time on appeal.").

PREP Tours's evidentiary submissions do show, as its complaint alleges, that it sent Ramírez a "tentative rough draft" itinerary from Puerto Rico a few days after she made her initial inquiry about the trip and that PREP Tours then modified the itinerary in some respects while in Puerto Rico. In that regard, the properly documented actions that PREP Tours undertook in the forum in response to the defendants' inquiry were not entirely "unilateral," as the District Court suggested.

But, even accepting that point, we do not see how we may reasonably infer from the showing that PREP Tours makes regarding the itinerary that it foreseeably undertook the kind of "extensive" activities in response to Ramírez's remote communications that the tour company asserts on appeal that it undertook in order to put together and modify this proposal. After all, the promotional brochure that PREP Tours sent to Ramírez on the very day that she first inquired for an offer described a pre-existing "unique soccer program" based in San Juan and Rincón that PREP Tours offered to visiting youth soccer teams.

The record does also show that PREP Tours then sent Ramírez a "tentative rough draft" itinerary a few days later. But, the record does not show (nor does the complaint allege) what work in Puerto Rico was done by PREP Tours in order to put together

that itinerary or that there is a basis for inferring that the defendants anticipated that PREP Tours would on the basis of their initial request for information engage in extensive in-forum activity.

Nor, as far as the record reveals, did PREP Tours add any newly identified hotels, restaurants, or local soccer teams to that "tentative rough draft" of the itinerary over the course of the ensuing months.[20]  In fact, in an email to Ramírez after the largest, albeit still quite modest, round of documented changes to the "tentative rough draft" itinerary, PREP Tours itself called "the new itinerary almost identical to the original itinerary that we first sent you."

We also cannot reasonably infer that the defendants could have foreseen the type of "extensive" activities that PREP Tours asserts to us on appeal that it undertook beyond the sending of a pre-existing tentative itinerary.  PREP Tours's evidentiary submissions do show in this regard that the tour company sent an email to Ramírez that mentions that it had contacted hotels in Puerto Rico after Ramírez had reached out to the tour company and that these hotels then placed courtesy holds on certain rooms.  In addition, we can reasonably infer from the email that Hakuna

---

[20] The dissent states that PREP Tours "proceeded to make concrete arrangements with other businesses, including flight and hotel reservations."  Diss. Op. 52.  But, the complaint itself makes no such allegation.

Matata, the third-party travel agency in Florida, sent to the defendants regarding possibly arranging flights for them that PREP Tours had at some point contacted Hakuna Matata from within Puerto Rico to ask Hakuna Matata to do so.[21]  But, the record does not show that the defendants had actually requested that PREP Tours arrange for the courtesy holds on the hotel rooms.  Rather, the record reveals that the defendants asked only in general and tentative terms about what PREP Tours, which represents itself as a "speciali[st]" in such soccer tours, could "offer."

In fact, the record does not show that the defendants ever asked PREP Tours to contact any entity or person in Puerto Rico on their behalf.  Nor does the record show that they ever requested any particular hotel, restaurant, soccer team, or business to be included in the proposed itinerary.[22]  And we see no basis for concluding -- nor does PREP Tours appear to even argue -- that the defendants should "reasonably have anticipated being 'haled before a [Puerto Rico] court'" simply in consequence of

---

[21] PREP Tours had at one point also emailed Ramírez a menu of possible flights, but PREP Tours acknowledged in a later email that it did not book any flights on AYSO's behalf because it did not yet have a sufficient indication from AYSO that the organization wished to proceed with the flights.

[22] The record does show that in her email requesting a "tweak" to the "tentative rough draft" itinerary, Ramírez asked if it would be possible to include "all-inclusive hotels."  PREP Tours expressly rejected that request, however, explaining that it would not be cost-effective to stay in all-inclusive hotels.

PREP Tours's efforts to obtain preliminary information about the cost and availability of hotels in Puerto Rico for the trip's possible dates, or its efforts to contact a travel agency located outside the forum regarding possible flights. Kulko, 436 U.S. at 97-98 (quoting Shaffer v. Heitner, 433 U.S. 186, 216 (1977)).

PREP Tours does assert in its appellate brief that AYSO had taken similar cultural immersion trips in the past. PREP Tours thus reasons that the defendants should have reasonably foreseen the extent of activities in Puerto Rico that would have been necessary to produce a proposed itinerary for such a trip.[23] But, we cannot see how it would be reasonable to infer from the mere fact of this past experience that the organization would foresee that a tour company that "specializes" in such trips would undertake "extensive" activities in Puerto Rico simply to prepare a price quote and proposed itinerary for its regularly offered service in response to a preliminary request for that information from a group that consistently made clear that it was considering using other travel agencies.

For all of these reasons, this case is not at all like the imputed-contacts cases on which PREP Tours relies, namely C.W. Downer and Cossart. In C.W. Downer, the out-of-forum defendant

---

[23] Although the complaint does not allege that AYSO took similar trips in the past, one of Ramírez's emails in the record indicates that AYSO's teams had traveled to Costa Rica and Hawaii in prior years.

corporation had specifically engaged the in-forum investment bank to sell the company, thus making foreseeable the fact that the bank "contacted hundreds of potential buyers on [the corporation's] behalf." 771 F.3d at 67. Likewise, in Cossart, the out-of-forum firm had hired the employee to do the kind of work that would make it foreseeable that he would have "made hundreds of telephone calls and sent hundreds of e-mails on behalf of [the employer]" from the forum. 804 F.3d at 17.

Again, neither of those cases purports to set the minimum threshold for establishing personal jurisdiction on the basis of the activities of an in-forum plaintiff that may be imputed to an out-of-forum defendant. But, PREP Tours identifies no other precedents that would support the conclusion that, given the context in which the inquiry about the trip was made, the tour company's properly documented activities that reasonably may be attributed to the defendants are of a nature and quality to show that they should have reasonably anticipated being haled into court in Puerto Rico as a result. Nor, we note, does the dissent.

**V.**

Questions of purposeful availment are often, like those presented here, necessarily fact-dependent. In this area, as the Supreme Court has cautioned, there are no mathematical formulas upon which to rely. And the hues are more "grey[]" than "black and white." See Kulko, 436 U.S. at 92 (quoting Estin, 334 U.S. at

- 39 -

545).  But, in light of <u>Copia</u>, and the other precedents bearing on these questions, we conclude that on this record -- especially given that what is missing consists of information fully known to the in-forum party asserting jurisdiction -- there is no basis for finding the purposeful availment requirement met for either of the plaintiff's claims.

The judgment of the District Court is **<u>affirmed</u>**.


- **Dissenting Opinion Follows -**

**LIPEZ**, **Circuit Judge, dissenting**.  In concluding that the federal court in Puerto Rico lacks personal jurisdiction over the defendants in this case, the majority downplays the significance of the bad-faith negotiations claim and fails to view the facts alleged in the light most favorable to the plaintiff. Properly evaluated, however, those facts establish the elements of personal jurisdiction for PREP Tours' lawsuit against three of the defendants.[24]  Given these circumstances, I cannot join my colleagues in affirming dismissal of PREP Tours' complaint.

**I.**

**A. Overview**

My disagreement with the majority stems primarily from their depiction of the facts proffered by PREP Tours in support of jurisdiction.[25]  In brief summary, defendants asked PREP Tours to

---

[24] I agree that dismissal is proper for Armando Rodríguez, Ramón Aguilar, and Carl Jackson, but conclude that the case should proceed against the American Youth Soccer Organization ("AYSO"), its regional affiliate ("Region 24"), and a Region 24 volunteer, Alicia Ramírez (collectively, "defendants").  For simplicity, I assume that Ramírez was an agent of AYSO and Region 24 and, thus, that these three defendants are in the same position vis-à-vis PREP Tours.

[25] The district court chose the "prima facie" method -- "the least taxing" standard for a plaintiff -- to determine whether PREP Tours had met its personal jurisdiction burden. Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008) (quoting Rodriguez v. Fullerton Tires Corp., 115 F.3d 81, 83 (1st Cir. 1997)).  In line with that method, the facts on which I rely are drawn from PREP Tours' complaint and the supplemental materials contained in the record.  See Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016) (noting

- 41 -

plan a soccer tour in Puerto Rico for more than 250 people. Then, on the brink of formalizing an agreement based on PREP Tours' considerable efforts, defendants made a last-minute switch to a different tour company. Contrary to my colleagues' depiction of the parties' relationship as undeveloped and "preliminary," the record demonstrates an increasingly solid commitment by defendants to do business with PREP Tours. Defendants' sudden abandonment of PREP Tours after the company invested substantial resources to create defendants' desired itinerary permits a plausible inference of bad faith, a key component of PREP Tours' contention that it was harmed by defendants' actions.

## B. Culpa in Contrahendo

Under Puerto Rico law, the obligation to negotiate contracts in good faith is known as the culpa in contrahendo doctrine. See Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH, 781 F.3d 510, 516 (1st Cir. 2015). The doctrine varies from the common law requirement of good-faith negotiation not only because it sounds in tort rather than contract, but also because it encompasses a broader range of

that when conducting a personal jurisdiction analysis under the prima facie standard, a court must "take the facts from the pleadings and whatever supplemental filings (such as affidavits) are contained in the record"; see also Sawtelle v. Farrell, 70 F.3d 1381, 1385-86 (1st Cir. 1995) (explaining that in assessing a motion to dismiss based on lack of personal jurisdiction, the court may consider supplemental materials such as affidavits).

conduct.  See Ysiem Corp. v. Commercial Net Lease Realty, Inc.,

328 F.3d 20, 24 (1st Cir. 2003).  In general, the culpa in

contrahendo doctrine is "used to compensate a party for the

expenses it incurred in reliance on the other party's offer to

form a contract when the contract negotiations break down."

Velázquez Casillas v. Forest Labs., Inc., 90 F. Supp. 2d 161, 166

(D.P.R. 2000).  We have explained that "[a] party's withdrawal

from contractual negotiations may be considered a violation of the

duty of good faith if: (1) the withdrawal was arbitrary or without

justification; and (2) the other party had a reasonable expectation

that a contractual agreement would be consummated."  Advanced

Flexible Circuits, 781 F.3d at 516-17.[26]

PREP Tours' complaint alleges a classic instance of

frustrated expectations, with defendants taking the parties'

negotiations to the brink of a formal agreement before pulling

---

[26] Some jurisdictions have similarly found a duty to negotiate
in good faith after the parties have negotiated important terms in
a potential contract but other terms remain open.  See, e.g.,
Flight Sys., Inc. v. Elec. Data Sys. Corp., 112 F.3d 124, 130 (3d
Cir. 1997) (Pennsylvania); Sunnyside Cogeneration Assocs. v. Cent.
Vt. Pub. Serv. Corp., 915 F. Supp. 675, 680 (D. Vt. 1996); Teachers
Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp. 491, 498
(S.D.N.Y. 1987); Markov v. ABC Transfer & Storage Co., 457 P.2d
535, 539-40 (Wash. 1969).  Moreover, other jurisdictions have
acknowledged some pre-contractual liability when the parties
started negotiations toward a contract but for some reason an
agreement could not be reached.  See, e.g., Chrysler Corp. v.
Quimby, 144 A.2d 123, 128-29 (Del. 1958); Hoffman v. Red Owl
Stores, Inc., 133 N.W.2d 267, 274-75 (Wis. 1965).

out.  The culpa in contrahendo tort claim must thus be at the fore

of the evaluation of personal jurisdiction.[27]  Cf. Copia Commc'ns,

LLC v. AMResorts, L.P., 812 F.3d 1, 4 n.2 (1st Cir. 2016) (noting

that "[b]ecause all of [plaintiff]'s claims are entwined in its

contract claims, none demands separate analysis").

## II.

As the majority opinion sets out, the constitutional

inquiry for specific personal jurisdiction consists of three

prongs: relatedness, purposeful availment, and reasonableness.

See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,

290 F.3d 42, 60 (1st Cir. 2002); Phillips Exeter Acad. v. Howard

Phillips Fund, 196 F.3d 284, 288 (1st Cir. 1999).[28]  The majority

considers only the purposeful availment prong and, concluding that

---

[27] By focusing on the tort claim, I am not suggesting that the purposeful availment analysis varies from cause of action to cause of action when the same contacts are asserted as the basis for personal jurisdiction.  Nonetheless, "[q]uestions of specific jurisdiction are always tied to the particular claims asserted," Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 289 (1st Cir. 1999), and "the quality and nature of the defendant's activity" is part of the calculus, Harlow v. Children's Hosp., 432 F.3d 50, 58 (1st Cir. 2005) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).  I highlight the bad-faith claim because -- given the nature of defendants' contacts with PREP Tours -- the tort claim reveals so clearly the error in the majority's purposeful availment analysis and the unfairness of the outcome.

[28] Where a state's long-arm statute extends to the constitutional limit, as in Puerto Rico, we may address the statute's requirements by conducting the constitutional due process analysis.  See Dalmau Rodriguez v. Hughes Aircraft Co., 781 F.2d 9, 12 (1st Cir. 1986).

- 44 -

it does not support personal jurisdiction, does not address the other two prongs.  Accordingly, I, too, primarily focus on purposeful availment.

The purposeful availment inquiry requires us to determine whether the defendants have targeted their conduct "toward the society or economy of a particular forum [such that] the forum should have the power to subject the defendant to judgment regarding that behavior."  Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 36 (1st Cir. 2016) (quoting Carreras v. PMG Collins, LLC, 660 F.3d 549, 555 (1st Cir. 2011)) (alteration in original).  This assessment ensures that personal jurisdiction is not premised solely on defendants' "'random, isolated or fortuitous contacts' with the forum state."  Adelson v. Hananel, 510 F.3d 43, 50 (1st Cir. 2007) (quoting Sawtelle v. Farrell, 70 F.3d 1381, 1391 (1st Cir. 1995)).

The "cornerstones" of purposeful availment are voluntariness and foreseeability. Daynard, 290 F.3d at 61 (quoting Sawtelle, 70 F.3d at 1391).  Voluntariness means that a defendant's "contacts with the forum state 'proximately result from actions by the defendant himself.'"  Phillips v. Prairie Eye Ctr., 530 F.3d 22, 28 (1st Cir. 2008) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)).  Foreseeability means that "the defendant's conduct and connection with the forum state are such

that he should reasonably anticipate being haled into court there."
World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

The majority relies heavily on our decision in Copia, 812 F.3d at 5-6, in concluding that defendants' actions in dealing with PREP Tours are insufficient to satisfy the purposeful availment requirement. Given Copia's importance to the majority's analysis, describing the case in some detail helps to explain why our court's rejection of personal jurisdiction there does not control the outcome here.

In Copia, the plaintiff was a Massachusetts company that brought suit in Massachusetts against a Jamaican resort operator and its Pennsylvania alter ego for an alleged breach of contract. The Jamaican company had virtually no connection with Massachusetts. The negotiations between the parties were initiated by the plaintiff, not the defendant -- i.e., the parties' relationship began with the Massachusetts plaintiff reaching out to the defendant in Jamaica. The contract at issue was for services to be performed in Jamaica, with Jamaican employees, and under Jamaican law. The defendant's only Massachusetts contacts consisted of sending a few emails to plaintiff's CEO in Massachusetts and receiving equipment shipped from there.

Unsurprisingly, the Copia panel held that the Jamaican resort could not be haled into court in Massachusetts to defend the breach of contract claim. Copia, 812 F.3d at 6. Drawing on

earlier precedents of our court, we noted three factors as relevant to purposeful availment: "the defendant's in-forum solicitation of the plaintiff's services, the defendant's anticipation of the plaintiff's in-forum services, and the plaintiff's actual performance of extensive in-forum services."[29]  Id.  The panel found that the plaintiff failed to satisfy any of the three factors.  First, the Jamaican resort had not solicited services from the plaintiff; rather, the plaintiff had contacted the resort. Second, the Jamaican resort would not have anticipated that services under the contract would be performed in Massachusetts given that the contract was for services to be performed in Jamaica.  Third, the services under the contract were actually performed in Jamaica, excepting some "insubstantial contacts that anyone would have when buying goods and services from a company that itself happens to be in Massachusetts."  Id.[30]

---

[29] These factors were previously applied in two cases where the out-of-forum defendants' contacts occurred primarily through remote communications.  See Cossart v. United Excel Corp., 804 F.3d 13, 21 (1st Cir. 2015); C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 66-67 (1st Cir. 2014).  Although the focus on these factors may not be suited for all remote communications cases -- particularly where the plaintiff's claims sound primarily in tort -- focusing on them here is appropriate to highlight the differences between my view of the facts and the majority's view.

[30] Although some equipment was shipped from Massachusetts, the contract did not require shipment from any particular location. See Copia, 812 F.3d at 5.

Here, by contrast, there are far more substantial connections between defendants and the forum. Indeed, applying the Copia factors to the facts of this case reveals the error in the majority's analysis.[31]

## A. Solicitation of plaintiff's services

It is difficult to imagine a more clear-cut instance of an out-of-forum defendant voluntarily and directly soliciting an in-forum plaintiff's services. In November 2012, defendants commenced a four-month period of communications with PREP Tours, initially seeking information about options available in Puerto Rico for their soccer group's possible tour. PREP Tours first responded with a standard promotional brochure describing a youth soccer program available in Puerto Rico. Defendants' initial inquiry unquestionably was preliminary -- it did not even identify Puerto Rico as the confirmed destination -- and PREP Tours' response likewise involved no individualized effort on behalf of defendants. However, even though defendants' initial contact merely opened the door to a possible business relationship with

---

[31] The majority also contrasts the facts here with the two primary cases on which PREP Tours relies to argue that personal jurisdiction is appropriate: Downer, 771 F.3d at 67, and Cossart, 804 F.3d at 21. As the majority acknowledges, however, Downer and Cossart do not "purpor[t] to establish the minimum connection to the forum that must be shown to establish personal jurisdiction." Hence, I see no need to compare the facts here with those cases to show that PREP Tours has shown the requisite connection.

PREP Tours in Puerto Rico, that first step acquired greater significance when the defendants subsequently started to solidify their plans with PREP Tours for a trip to Puerto Rico. Without question, Copia's solicitation prong is satisfied.

**B. Defendants' anticipation of in-forum services and plaintiff's actual performance of in-forum services**[32]

The parties' relationship progressed rapidly after defendants' initial inquiry. PREP Tours prepared a proposed itinerary, and the parties thereafter engaged in an exchange of emails in which defendants requested changes, PREP Tours responded with revisions, and the agency reserved hotels and flights. In their first round of requests, defendants asked PREP Tours to schedule two or three soccer games, two or three excursions for players and parents, and "free time for families to go on their own," all while keeping the cost to $2,000 per person, including airfare. PREP Tours complied and sent a revised itinerary to defendants.

Unsatisfied with the revised itinerary, defendants requested further modifications and specifications in late December 2012, including: (1) extending the length of the trip and scheduling it for July 8-18, with specific arrival and departure dates for various components of the tour; (2) scheduling three

---

[32] The second and third Copia factors substantially overlap, and I will therefore analyze them together.

local soccer games (i.e., specifying three, rather than possibly two, games); (3) and, again, directing that the overall cost of the trip remain at or below $2,000 per person. PREP Tours again complied, producing a third itinerary. Meanwhile, as PREP Tours worked to accommodate defendants' requests, defendants expressed satisfaction with PREP Tours' efforts and an intention to move forward with the trip arranged by PREP Tours. Defendants stated in a December email that they "loved [PREP Tours'] itinerary as opposed to [another] agency" and wanted to "seal the deal" so that the parents could start "pay[ing] the agency."

Any remaining doubt about defendants' commitment to PREP Tours was dispelled by the parties' communications in January 2013. Defendants sent PREP Tours a list of trip participants with ages and desired hotel accommodations. One of defendants' last emails to PREP Tours stated that AYSO's Region 24 board members would be contacting PREP Tours "for the financial part" and that, barring any "red flags," everything was going to "run smoothly." In a separate email thread, Hakuna Matata, the travel agency engaged by PREP Tours, contacted defendants seeking payment for the reserved flights.

Given these interactions, defendants had to understand that PREP Tours was taking significant steps to create an itinerary to satisfy their specific, changing requirements. Nevertheless, my colleagues question PREP Tours' allegation that it expended

considerable effort to meet defendants' demands, maintaining that defendants' communications sought only "tweak[s]" to the initial itinerary.[33]  In addition, my colleagues state that a self-proclaimed tour "specialist" would not need much effort to plan such a tour.  This speculative depiction of the record, suggesting that the series of requested revisions required minimal, if any, work by PREP Tours, fails to draw all reasonable inferences in PREP Tours' favor.  See Carreras, 660 F.3d at 552 (noting that, in assessing specific jurisdiction, the court must view the evidence "in the light most favorable to the plaintiff and draw all reasonable inferences therefrom in the plaintiff's favor").  To the contrary, it is reasonable to infer that drafting each new itinerary involved re-engaging with service providers to discuss new costs and timing (including booking hotels and flights), and reconfiguring the tour to satisfy defendants' specific budget and schedule demands.[34]

---

[33] In one of their emails, defendants referred to PREP Tours' modifications of the itinerary as "tweaks."

[34] In support of this inference, PREP Tours alleges in its complaint that defendants "caused [PREP Tours] to invest an enormous time and effort into preparing a package for [the tour] . . . according to defendants' specifications."  The parties' supplemental filings support that PREP Tours reached out to other Puerto Rico companies on defendants' behalf.  In one email reporting revisions to the itinerary, PREP Tours emphasized "the due diligence, dedication, research, hotel, transportation and schedule planning devoted to [defendants'] requests."

Moreover, the proposed trip was a major undertaking, involving travel, accommodations, meals, and activities for a group of 252 people, and represented an estimated half million dollars in business for PREP Tours and additional revenue for other Puerto Rico businesses. A trip of such magnitude inevitably would take substantial effort to plan and execute. And, indeed, the record confirms that PREP Tours did make considerable efforts on defendants' behalf. In addition to the work designing and reconfiguring the itineraries described above -- and with defendants' acknowledgement that they were close to formally engaging PREP Tours -- the company proceeded to make concrete arrangements with other businesses, including flight and hotel reservations.

The majority appears to contend that PREP Tours' provision of in-forum services must be viewed as largely unilateral -- and thus irrelevant to the question of whether defendants could foresee being haled into court in Puerto Rico. The suggestion of one-sided activity is unsupportable, however, given defendants'

---

The majority states that PREP Tours did not allege that it "contacted a single other business, soccer team, or person who did not work for PREP Tours in response to the defendants' inquiry." (Emphasis added.) If the majority is suggesting that PREP Tours did not contact anyone with whom they had no prior dealings, I fail to see the relevance of that fact. Even if some of these businesses had previously given a quote, it is a reasonable inference that PREP Tours had to contact them again each time defendants asked to modify the itinerary.

series of emails expressly asking PREP Tours to develop itineraries with specified requests.[35] It should have been obvious to defendants that PREP Tours could not respond to their inquiries without engaging with local companies -- repeatedly -- to ensure availability at the requested times and to determine the tour's cost.

Despite these extensive and extended interactions, driven by defendants' repeated requests, my colleagues also characterize the negotiations between the parties as "preliminary" in an effort to minimize the scope and quality of PREP Tours' efforts. Yet, negotiations prior to a formal agreement are always preliminary in a sequential sense. Here, the pre-contractual negotiations went well beyond the "just inquiring" phase to the brink of an agreement. Thus, discounting the extent of PREP Tours' in-forum activities because they were preliminary to a formal agreement unfairly ignores the significance of those activities for the purposeful availment inquiry. Put another way, defendants' contacts with PREP Tours forged a business relationship that was

---

[35] My colleagues, for example, state that PREP Tours was "push[ing]" defendants for more details when the company asked for the number of trip participants, which prompted Ramírez to send a document listing the names of players and coaches and indicating that a total of 252 people would be on the trip. Taken in the light most favorable to PREP Tours, however, the inquiry about participants was in fact a response to defendants' request to provide a quote for the tour that did not go above $2,000 per person.

sufficiently developed to "cross[] the purposeful availment threshold." Baskin-Robbins, 825 F.3d at 39.

## C. Summary

The circumstances here differ markedly from those in Copia. The facts alleged by PREP Tours, together with the reasonable inferences drawn therefrom, show that defendants targeted their conduct toward Puerto Rico and Puerto Rico businesses such that they should have foreseen the likelihood of being haled into court in Puerto Rico if a business dispute arose. See Burger King, 471 U.S. at 474. The primary products of a tour company include its ability to design an attractive itinerary suited to travelers' specified needs, and its capacity to reduce that itinerary to a confirmed plan with service providers. PREP Tours moved forward with that process, urged on by defendants' expression of satisfaction and indications that defendants were ready to "seal the deal." The flight and hotel reservations that PREP Tours secured reflect the firmness of the arrangements.

The fact that no contract ultimately was signed, and that the services performed therefore did not lead to additional activity by PREP Tours, does not diminish the extent of the work PREP Tours had performed when defendants abruptly pulled out of the relationship. Indeed, the essence of PREP Tours' tort claim is that the defendants unfairly ended the relationship, denying PREP Tours the opportunity to perform additional, compensable work

- 54 -

that should have been the return on their pre-contractual investment of time and resources.[36]

Moreover, the abrupt termination of the negotiations permits a reasonable inference that defendants strung PREP Tours along to extract, at no cost, the maximum advantage from its local knowledge and contacts, with the intent to pass along that information to the company that would ultimately be providing the Puerto Rico tour. Contrary to the scenario in Copia, the defendants' contacts with the forum were far from "random, isolated or fortuitous," Adelson, 510 F.3d at 50 (quoting Sawtelle, 70 F.3d at 1391), and the Puerto Rico district court "should have the power to subject [] defendant[s] to judgment regarding th[eir] behavior," Baskin-Robbins, 825 F.3d at 36 (quoting Carreras, 660 F.3d at 555).

## III.

Having thus explained why PREP Tours has satisfied the purposeful availment prong of the personal jurisdiction inquiry,

---

[36] In maintaining that the defendants' contacts here were less substantial than those found inadequate in Copia, the majority points out that the Copia negotiations involved "numerous contacts between the parties to secure an ongoing services relationship." But the quantity of contacts was not the problem in Copia; rather, the contacts were not sufficiently connected to the forum. Here, by contrast, every communication between the parties was sent to or from Puerto Rico, and each related to services to be performed in Puerto Rico. Hence, the substance of the contacts here -- i.e., the direct link to Puerto Rico -- carries far more weight in showing purposeful availment.

I turn to the remaining components: relatedness and reasonableness.

## A. Relatedness

The relatedness prong "focuses on the nexus between the defendant's contacts and the plaintiff's cause of action." Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 206 (1st Cir. 1994). Specifically with reference to PREP Tours' tort claim, it is apparent that the contacts described above -- i.e., the ongoing interactions between defendants and PREP Tours to plan the soccer tour to Puerto Rico -- are the core of the alleged bad-faith negotiations cause of action. Furthermore, the injury to PREP Tours from defendants' alleged freeloading was foreseeable to defendants, who misused a "product" -- the development of a specialized local itinerary -- that PREP Tours was selling.

Although defendants argue that the alleged injury occurred elsewhere -- i.e., in California, where they ultimately contracted with a local company -- the asserted tortious conduct was directed at Puerto Rico and the alleged harm occurred there. Where a defendant's contacts primarily consist of remote communications, we necessarily focus on the target of the communications and the effects in that forum. See Calder v. Jones, 465 U.S. 783, 789 (1984) (holding that jurisdiction in California was proper when the effects of defendants' intentional conduct in Florida were felt, and caused a tortious injury, in California).

Accordingly, defendants' substantial contacts with Puerto Rico clearly relate to the culpa in contrahendo tort claim.

**B. Reasonableness**

After a plaintiff has satisfied the relatedness and purposeful availment prongs of the personal jurisdiction analysis, defendants may nonetheless show that it would be unreasonable for the plaintiff's chosen forum to exercise jurisdiction over them. Courts have identified five so-called "gestalt factors" that "put into sharper perspective the reasonableness and fundamental fairness of exercising jurisdiction in particular situations." Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir. 1994). Those factors are:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

Adelson, 510 F.3d at 51 (quoting United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st Cir. 1992)).

Here, the factors inescapably weigh in favor of finding jurisdiction in Puerto Rico. First, despite defendants' assertion that it would be costly and burdensome for a non-profit organization located in California to litigate in Puerto Rico,

litigants can electronically submit filings to a court and video-conference from anywhere in the country, reducing the need to travel. Absent a "special or unusual burden," Pritzker, 42 F.3d at 64, defendants cannot assert distance as a barrier. Second, as to the forum state's interest, Puerto Rico has a clear interest in protecting its residents from conduct that targets and injures them. See, e.g., McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957) (noting a state's "manifest interest in providing effective means of redress for its residents when" they are injured by an out-of-state party). Third, PREP Tours' interest in resolving the dispute in Puerto Rico is obvious, and we have held that a plaintiff's choice of forum must be afforded a degree of deference. See Ticketmaster, 26 F.3d at 211. Fourth, we have observed that all sovereigns share an interest in "ensuring that [the sovereign's] companies have easy access to a forum when their commercial contracts are said to be breached by out-of-state defendants." Downer, 771 F.3d at 70. Puerto Rico's culpa in contrahendo doctrine reflects this interest in ensuring that injuries arising from pre-contractual relationships are conveniently redressed.[37]

---

[37] The fifth factor, the judicial system's interest, has no particular significance here. Although this litigation is already underway in Puerto Rico, and starting the suit anew in California would involve another court system, that situation presumably would exist in every case in which personal jurisdiction is challenged.

In sum, the gestalt factors do not even remotely show that it would be unfair for defendants to be "haled into court" in Puerto Rico to respond to PREP Tours' allegations.  World-Wide Volkswagen, 444 U.S. at 297.

**IV.**

Fairly read, with inferences properly drawn in favor of PREP Tours, the record reveals that personal jurisdiction over defendants is proper in Puerto Rico, PREP Tours' chosen forum. Accordingly, this case should not have been dismissed, and I therefore respectfully dissent.