# United States Court of Appeals
## For the First Circuit

No. 15-2190

BASKIN-ROBBINS FRANCHISING LLC,

Plaintiff, Appellant,

v.

ALPENROSE DAIRY, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Lipez, Circuit Judges.

Peter J. Klarfeld, with whom Eric L. Yaffe, Julia C. Colarusso, and Gray, Plant, Mooty, Mooty & Bennett, P.A. were on brief, for appellant.
Eric H. Karp, with whom Ari N. Stern and Witmer, Karp, Warner & Ryan LLP were on brief, for appellee.

June 6, 2016

**SELYA**, **Circuit Judge**.   This bi-coastal commercial dispute requires us to test the outer limits of a court's in personam jurisdiction, consistent with the constraints of the Due Process Clause.  See U.S. Const. amend. XIV, § 1.  The district court concluded that the defendant lacked sufficient contacts with the forum state (Massachusetts) to permit the exercise of jurisdiction and, accordingly, dismissed the action.  See Baskin-Robbins Franchising, LLC v. Alpenrose Dairy, Inc., No. 14-13771, 2015 WL 5680332, at *2 (D. Mass. Sept. 25, 2015).  Concluding, as we do, that the district court miscalibrated the jurisdictional scales, we reverse.

## I.  BACKGROUND

Baskin-Robbins Franchising LLC (Baskin-Robbins) is a Delaware special purpose limited liability company, which maintains its principal place of business in Canton, Massachusetts.  It franchises independent persons and entities to operate ice cream stores.  Alpenrose Dairy, Inc. (Alpenrose) is a dairy products manufacturer incorporated in Oregon and headquartered in Portland.

In 1965, Baskin-Robbins' predecessor in interest, Baskin-Robbins Inc. entered into a territorial franchise agreement (the Agreement) with Alpenrose.  At the time, Baskin-Robbins Inc. had its principal place of business in Glendale, California.  The negotiations surrounding the formation of the Agreement took place

- 2 -

in California.  When consummated, the Agreement gave Alpenrose the right to operate Baskin-Robbins franchises in Washington and Oregon for a six-year term, commencing on December 9, 1965. Subject to other conditions not relevant here, the Agreement gave Alpenrose an option to renew the franchise for successive six-year terms as long as it also furnished written notice to Baskin-Robbins at least one year prior to the expiration of the current term.

The Agreement obligated Alpenrose to comply with Baskin-Robbins' ever-changing specifications, recipes, and processes for the manufacture of ice cream products.  It likewise bound Alpenrose to a set of specific procedures for operating Baskin-Robbins stores.  These obligations required Alpenrose to have a certain amount of ongoing communication and coordination with Baskin-Robbins.

As might be expected, the Agreement controlled the financial relationship between the parties.  It required Alpenrose to pay royalties to Baskin-Robbins based on monthly sales.  The money stream flowed in both directions: Alpenrose recruited other franchisees for Baskin-Robbins, and the Agreement obligated Baskin-Robbins to make monthly remittances to Alpenrose based on royalties received by Baskin-Robbins from those franchisees.

Between 1973 and 1985, the parties amended the Agreement three times.  These amendments expanded Alpenrose's franchise territory to include Montana and parts of Idaho.  At the time of

each amendment, Baskin-Robbins remained headquartered in California. All material discussions and negotiations concerning the amendments took place in Oregon (Alpenrose's home state).

Alpenrose exercised its renewal options without incident on five occasions. Throughout this decades-long period, Baskin-Robbins underwent several ownership changes. Around 1998 — some thirty-three years after Baskin-Robbins and Alpenrose first executed the Agreement — the current owners moved Baskin-Robbins' headquarters from California to Massachusetts.

In 2001 (as it had done every six years since 1965), Alpenrose sent Baskin-Robbins formal notice of its election to renew the Agreement. Alpenrose directed this notice to Baskin-Robbins' newly relocated headquarters in Massachusetts. The Agreement was thus extended for yet another six-year term.

In 2006, the ownership of Baskin-Robbins' parent company again changed hands.[1] Baskin-Robbins' headquarters remained in Massachusetts and, in November of 2007, Alpenrose renewed the Agreement for another six-year term (running from December 9, 2008 to December 8, 2014). This renewal notice — like the immediately preceding renewal notice — was sent to Baskin-Robbins in Massachusetts.

---

[1] It was at this point that Baskin-Robbins Franchising LLC was formed. That entity thus became the successor in interest to Baskin-Robbins Inc.

- 4 -

Under the provisions of the Agreement, Alpenrose had until December 8, 2013 to notify Baskin-Robbins of its intent to renew for a further six-year term. On December 2, 2013, Alpenrose informed Baskin-Robbins that it did not intend to renew the Agreement, stating: "[P]lease consider this our one year notice of intent to not renew. . . . [M]aybe it's time to take a slightly different direction." Baskin-Robbins did not formally acknowledge that the Agreement would lapse, but the parties began negotiating the terms of Alpenrose's transition out of the franchise arrangement. The negotiations stalled and, on July 22, 2014, Alpenrose wrote to Baskin-Robbins, stating that it wished to "revoke" its decision not to renew. Instead, it requested another six-year extension of the Agreement, to begin when the current term expired (that is, on December 8, 2014). Alpenrose later warned that it would otherwise be entitled to fair compensation under the Washington Franchise Investment Protection Act, see Wash. Rev. Code § 19.100.180(2)(i).

Baskin-Robbins responded that Alpenrose had waited too long and was no longer entitled to renew the Agreement. At the same time, it rejected Alpenrose's suggestion that any compensation was due in consequence of the non-renewal of the franchise. Then — with an impasse in the offing — Baskin-Robbins raced to the United States District Court for the District of Massachusetts and sued for a judicial declaration that "the

- 5 -

[Agreement] and all of Alpenrose's rights associated therewith will expire on December 8, 2014," and that "Alpenrose is not entitled to any compensation in connection with the expiration of the [Agreement]." The record sheds no light on the current status of the parties' commercial relationship.

Alpenrose moved to dismiss for lack of personal jurisdiction and improper venue, see Fed. R. Civ. P. 12(b)(2), (3), or in the alternative to transfer venue to the United States District Court for the Western District of Washington, see 28 U.S.C. § 1404(a). Baskin-Robbins opposed both motions. After considering the parties' arguments, the district court dismissed the case for want of in personam jurisdiction. See Baskin-Robbins Franchising, 2015 WL 5680332, at *2. The court concluded that "nothing in [the parties'] history . . . suggests that Alpenrose intended to purposefully avail itself of the privilege of conducting business within Massachusetts." Id.

This timely appeal followed.

## II. ANALYSIS

"Where, as here, a district court dismisses a case for lack of personal jurisdiction based on the prima facie record, rather than after an evidentiary hearing or factual findings, our review is de novo." C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 65 (1st Cir. 2014). In conducting this de novo review, we are not bound by the district court's reasoning

- 6 -

but, rather, may affirm the judgment for any reason made evident by the record.  See Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999).

The plaintiff has the burden of establishing that jurisdiction over the defendant lies in the forum state.  See Adelson v. Hananel, 510 F.3d 43, 48 (1st Cir. 2007).  "Faced with a motion to dismiss for lack of personal jurisdiction, a district court 'may choose from among several methods for determining whether the plaintiff has met [its] burden.'"  Id. (alteration in original) (quoting Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50-51 (1st Cir. 2002)).  Here, the district court employed the prima facie method, which requires no differential factfinding; rather, this method requires only that a plaintiff proffer evidence which, taken at face value, suffices to show all facts essential to personal jurisdiction.  See id.; Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995).

For the purpose of examining the merits of such a jurisdictional proffer, we — like the district court — take the facts from the pleadings and whatever supplemental filings (such as affidavits) are contained in the record, giving credence to the plaintiff's version of genuinely contested facts.  See Sawtelle v. Farrell, 70 F.3d 1381, 1385 (1st Cir. 1995).  We may, of course,

take into account undisputed facts put forth by the defendant. See C.W. Downer, 771 F.3d at 65.

The case before us is a diversity case. See 28 U.S.C. § 1332(a). "In determining whether a non-resident defendant is subject to its jurisdiction, a federal court exercising diversity jurisdiction 'is the functional equivalent of a state court sitting in the forum state.'" Sawtelle, 70 F.3d at 1387 (quoting Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir. 1994)).[2] It follows that Baskin-Robbins must show that the district court's assertion of personal jurisdiction over Alpenrose would satisfy the requirements of both the Due Process Clause of the federal Constitution and the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3.

The jurisdictional requirements imposed by the Massachusetts long-arm statute are quite similar to, though not completely congruent with, the jurisdictional requirements imposed by the Due Process Clause. See Cossart v. United Excel Corp., 804 F.3d 13, 18 (1st Cir. 2015). Because the modest difference between

---

[2] Indeed, the federal court's role is the same in a federal question case. See Fed. R. Civ. P. 4(k)(1)(A); see also 4 Charles Alan Wright et al., Federal Practice & Procedure § 1068.1, at 691 (4th ed. 2015) ("[W]ith one exception the Rule 4(k) framework does not treat federal question cases differently than cases where a federal court adjudicates state-created rights based on diversity of citizenship jurisdiction.").

these requirements is not material here, we move directly to the constitutional analysis.[3]

The Due Process Clause of the Fourteenth Amendment requires that a defendant "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). This due process test is flexible and fact-specific, "written more in shades of grey than in black and white." Phillips Exeter, 196 F.3d at 288.

Consistent with the demands of due process, a federal district court may exercise either general or specific jurisdiction over a defendant. See Cossart, 804 F.3d at 20. Baskin-Robbins has not proffered a claim of general jurisdiction but, rather, has asserted only a claim of specific jurisdiction as the basis for the district court's jurisdiction. We limit our appraisal accordingly.

---

[3] For jurisdiction to exist under section 3(a) of the Massachusetts statute, "the facts must satisfy two requirements — the defendant must have transacted business in Massachusetts, and the plaintiff's claim must have arisen from the transaction of business by the defendant." Tatro v. Manor Care, Inc., 625 N.E.2d 549, 551 (Mass. 1994); see Mass. Gen. Laws ch. 223A, § 3(a). This standard is not especially rigorous: "an isolated and transitory contact with the forum . . . is all the statute requires." Nova Biomed. Corp. v. Moller, 629 F.2d 190, 195 (1st Cir. 1980).

Specific jurisdiction allows a court to hear a particular case as long as "that case relates sufficiently to, or arises from, a significant subset of contacts between the defendant and the forum." Phillips Exeter, 196 F.3d at 288. The existence vel non of specific jurisdiction depends on the results of a tripartite inquiry. We evaluate: "(1) whether the claim 'directly arise[s] out of, or relate[s] to, the defendant's forum state activities;' (2) whether the defendant's in-state contacts 'represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable;' and (3) whether the exercise of jurisdiction is reasonable." C.W. Downer, 771 F.3d at 65 (quoting Daynard, 290 F.3d at 60). All three of these elements must be present for specific jurisdiction to attach. See Phillips Exeter, 196 F.3d at 288.

Under this framework, the first element is relatedness. Relatedness requires that "the action . . . directly arise out of the specific contacts between the defendant and the forum state." Sawtelle, 70 F.3d at 1389. This requirement "serves the important function of focusing the court's attention on the nexus between a plaintiff's claim and the defendant's contact with the forum." Id. Relatively speaking, the relatedness inquiry is to be resolved

- 10 -

under "a flexible, relaxed standard." Pritzker v. Yari, 42 F.3d 53, 61 (1st Cir. 1994).

Baskin-Robbins argues that its claims arise from Alpenrose's letters to Baskin-Robbins in 2013 and 2014, both of which were sent to Baskin-Robbins' offices in Massachusetts. The first letter communicated Alpenrose's decision not to renew the Agreement; the second letter constituted Alpenrose's attempt to reverse direction by revoking that decision and exercising its option to renew the Agreement for another six years.

In its complaint, Baskin-Robbins seeks declarations both that Alpenrose's second letter did not effectively renew the Agreement (with the result that the Agreement expired on December 8, 2014) and that Alpenrose is not entitled to any compensation in connection with the expiration of the Agreement. We agree with Baskin-Robbins that these claims arise directly out of Alpenrose's in-forum contacts. See Sawtelle, 70 F.3d at 1389.

Our conclusion is not altered by Alpenrose's asseveration that "the question of expiration arises first out of the [Agreement] itself" and "[i]t is only in the context of the [Agreement] itself that the two letters relating to expiration can be analyzed." Although it is transparently clear that the Agreement itself ultimately determines the effect of Alpenrose's two letters (that is, whether those letters collectively resulted in renewal of the Agreement), it is the letters that set the

present controversy in motion.  That creates a sufficient nexus between Alpenrose's letters and Baskin-Robbins' claims to satisfy the flexible and relaxed standard for relatedness.[4]

This brings us to the next element of the jurisdictional analysis: purposeful availment.  The purposeful availment inquiry asks whether a defendant has "deliberately target[ed] its behavior toward the society or economy of a particular forum [such that] the forum should have the power to subject the defendant to judgment regarding that behavior."  Carreras v. PMG Collins, LLC, 660 F.3d 549, 555 (1st Cir. 2011).  Such a requirement guarantees that a defendant will not be subjected to the exercise of jurisdiction based solely on "'random, isolated or fortuitous' contacts with the forum state."  Adelson, 510 F.3d at 50 (quoting Sawtelle, 70 F.3d at 1391).  It also ensures that a defendant will not be swept within a state's jurisdictional reach due solely to the "unilateral activity of another party or a third person." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417 (1984)).

---

[4] If more were needed — and we doubt that it is — Alpenrose's 2001 and 2007 renewal notices, both of which were forwarded to Baskin-Robbins in Massachusetts, created a nexus between the Agreement itself and the forum state.  As we explain infra, Alpenrose "had an ongoing connection with Massachusetts in the performance under the contract," C.W. Downer, 771 F.3d at 66, which is sufficient to establish relatedness.

The main ingredients of purposeful availment are voluntariness and foreseeability. See C.W. Downer, 771 F.3d at 66. Voluntariness requires that "the defendant's contacts with the forum state 'proximately result from actions by the defendant himself.'" Phillips v. Prairie Eye Ctr., 530 F.3d 22, 28 (1st Cir. 2008) (emphasis in original) (quoting Burger King Corp., 471 U.S. at 475). Foreseeability requires that a defendant's contacts with the forum state are "such that [the defendant] could 'reasonably anticipate being haled into court there.'" Adelson, 510 F.3d at 50 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

It is apodictic that "the mere existence of a contractual relationship between an out-of-state defendant and an in-state plaintiff does not suffice, in and of itself, to establish jurisdiction in the plaintiff's home state." Phillips Exeter, 196 F.3d at 290; see Bond Leather Co. v. Q.T. Shoe Mfg. Co., 764 F.2d 928, 933 (1st Cir. 1985). Here, Baskin-Robbins relies chiefly on two kinds of contacts in endeavoring to demonstrate Alpenrose's purposeful availment of the privilege of conducting business in Massachusetts. One set of contacts comprises the renewal notices sent by Alpenrose to Baskin-Robbins in Massachusetts (one in 2001 and another in 2007). The other set of contacts consists, in Baskin-Robbins' words, of Alpenrose's actions in "carr[ying] on a highly interactive business relationship with [Baskin-Robbins] in

- 13 -

Massachusetts for twelve years."  Arguing the latter point, Baskin-Robbins explains that "Alpenrose exchanged communications, information, products, and payments with [Baskin-Robbins] at its headquarters in Massachusetts," knowing and intending that Baskin-Robbins would perform various support and oversight functions there.

Given the parties' franchisor-franchisee relationship, the logical starting point is the Supreme Court's seminal decision in Burger King.  We first query whether this decision controls and conclude that it does not.  There, the Court upheld the Florida courts' exercise of jurisdiction over a Michigan franchisee of a Florida franchisor.  The Court placed its primary emphasis on the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing."  Burger King, 471 U.S. at 479.  It concluded that these matters were Florida-centric: after all, the franchisee had "entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida."  Id. at 480.  In that way, he had voluntarily accepted "long-term and exacting regulation of his business from Burger King's Miami headquarters."  Id.

In finding that Florida could constitutionally exercise in personam jurisdiction over the franchisee, the Court relied heavily on the contractual documents, which specified "that Burger

- 14 -

King's operations are conducted and supervised from the Miami headquarters, that all relevant notices and payments must be sent there, and that the agreements were made in and enforced from Miami." Id. Consistent with this contractual format, the parties' course of dealing made manifest "that decisionmaking authority was vested in the Miami headquarters and that the [Burger King] district office served largely as an intermediate link between the headquarters and the franchisees." Id. at 480-81. To cinch matters, the Court gave weight to the fact that many of the franchise documents provided for all disputes to be governed by Florida law. See id. at 481.

To be sure, the case at hand also involves a suit by a franchisor that is trying to hail a franchisee into a court in its home state. But the similarity to Burger King stops there: the contract documents in this case evince no ties to Massachusetts. They do not specify that any services are to be performed in or from Massachusetts, that the nerve center of the franchisor's operations is to be in Massachusetts, or that Massachusetts law will control any aspect of the parties' dealings.[5] This is a critically important distinction. While the Burger King Court

---

[5] Here — unlike in Burger King — the contract documents are devoid of any choice-of-law provision or similar clause that might have alerted the franchisee to the possibility that disputes would be governed by the laws of the state in which the franchisor might from time to time choose to be headquartered.

found that the franchisee should have "envisioned continuing and wide-reaching contacts with Burger King in Florida" from and after the time that the franchise agreement was signed, id. at 480, the record here does not permit a similar finding.

We add, moreover, that the franchisee's contacts with Burger King in Florida were foreseeable precisely because Burger King was located in Florida when the franchise agreement materialized. Not so here: when Alpenrose and Baskin-Robbins joined forces in 1965, Baskin-Robbins was headquartered in California and that state had been the locus of the negotiations that led up to the franchise agreement. Baskin-Robbins remained in California while the Agreement was thrice amended, and those amendments were negotiated in Oregon. Massachusetts was in no way involved and, at least up to that point, neither the contract documents nor the parties' course of dealing contemplated any relationship between Alpenrose and Baskin-Robbins in Massachusetts. The upshot, then, is that while Burger King informs our determination, it does not dictate the result.

We turn next to the 2001 and 2007 renewal notices, both of which were sent by Alpenrose to Baskin-Robbins in Massachusetts. It must be recalled, however, that these notices were mailed into Massachusetts only because Baskin-Robbins chose to relocate there some thirty-three years into the parties' contractual relationship. The right to renew was embedded in the Agreement

- 16 -

from its inception, and the record contains no evidence that Alpenrose reached out to Massachusetts to solicit that right. The mere fact that Alpenrose exercised a previously granted right by mailing a notice into Massachusetts is insufficient, in itself, to ground a claim that a party has deliberately targeted its behavior toward the economy of Massachusetts. See Copia Commc'ns, LLC v. AMResorts, L.P., 812 F.3d 1, 5-6 (1st Cir. 2016) (explaining that defendant's mailing of contract nonrenewal notice to plaintiff's "registered office" in Massachusetts was insufficient to confer jurisdiction); Prairie Eye, 530 F.3d at 29 (observing that similar ministerial acts — such as the act of mailing a completed contract to Massachusetts for signature and sending three follow-up e-mails — were insufficient to confer jurisdiction). For this purpose, we regard Baskin-Robbins' move to Massachusetts as "unilateral activity" of the sort that, standing alone, cannot subject another party to jurisdiction. Burger King, 471 U.S. at 475 (quoting Helicopteros Nacionales de Colombia, 466 U.S. at 417).

Here, however, Baskin-Robbins' unilateral decision to move to Massachusetts does not stand alone. Baskin-Robbins' position is bolstered by a set of physical contacts between Alpenrose and Massachusetts. In 2006, Alpenrose's co-president, Rod Birkland, journeyed to Massachusetts and paid a courtesy visit to Baskin-Robbins' new owners. Even though such a single, isolated trip by a defendant to the forum state ordinarily would carry

little or no weight in the minimum contacts calculus, see id. at 479 & n.22, other contacts occurred here. We explain briefly.

While in Massachusetts, Baskin-Robbins has maintained a Brand Advisory Council (BAC), which is comprised of approximately eight representatives from the franchisee community. The BAC meets quarterly. Between 2011 and 2014, Kim Birkland, Alpenrose's director of franchise relations, traveled to Baskin-Robbins' Massachusetts headquarters at least twice to attend these meetings. Moreover, Baskin-Robbins has identified three additional sets of contacts: royalty payments sent by Alpenrose each month to Baskin-Robbins in Massachusetts; remittance payments sent each month by Baskin-Robbins to Alpenrose from its Massachusetts headquarters; and Baskin-Robbins' performance of a compendium of services in Massachusetts to Alpenrose's behoof. These services include product testing, processing of customer complaints, and product supply planning.

Viewed in isolation, the payment flows between Alpenrose and Baskin-Robbins are suggestive, though perhaps inconclusive. Although courts have found the sending of occasional payments into the forum state to lack any "decretory significance" in the jurisdictional calculus, Phillips Exeter, 196 F.3d at 291, this case involves a constant stream of payments between Baskin-Robbins and Alpenrose. Over a period of nearly 14 years, Alpenrose mailed 180 royalty checks to Baskin-Robbins' Massachusetts headquarters.

Meanwhile, Baskin-Robbins — from that headquarters — sent 176 checks to Alpenrose. This pattern of repetitive interactions involving Massachusetts is jurisdictionally significant, especially since the reciprocal flow of payments unquestionably facilitated the continuous transaction of business between the parties.

The sockdolager, in this instance, is Baskin-Robbins' performance of services in Massachusetts on Alpenrose's behalf. Baskin-Robbins persuasively asserts that its performance of such services places this case squarely within the rubric of in-forum service contract cases, in which a finding of purposeful availment is typically based, in part, on the defendant's anticipation that the plaintiff will provide in-forum services and the plaintiff's provision of those in-forum services. See Copia, 812 F.3d at 6. We agree.

By twice renewing its Agreement with Baskin-Robbins, Alpenrose knowingly caused Baskin-Robbins to undertake in Massachusetts a plethora of activities on its behalf. To illustrate, as part of Baskin-Robbins' quality assurance process, Alpenrose delivered samples of its various ice cream flavors to Baskin-Robbins' Massachusetts headquarters four times each year, commencing in 2003. Once Baskin-Robbins finished testing the samples in Massachusetts, a Baskin-Robbins manager would communicate the results to Alpenrose. More extensive

conversations ensued whenever any of the samples required improvement. Given the steady stream of samples sent by Alpenrose to Baskin-Robbins' Massachusetts redoubt, Alpenrose can hardly claim that it was unforeseeable that Baskin-Robbins was continually performing product testing on its behalf in Massachusetts. See C.W. Downer, 771 F.3d at 67.

Baskin-Robbins' performance under the Agreement encompassed a range of other Massachusetts activities as well. It maintained a customer service department at its Massachusetts headquarters, where customers across the country could report complaints about any Baskin-Robbins store (including those stores operated, directly or indirectly, under the aegis of Alpenrose). A Baskin-Robbins representative would then liaise with her Alpenrose counterpart regarding any complaints that originated in Alpenrose's territory.

So, too, Baskin-Robbins — from its Massachusetts headquarters — coordinated with Alpenrose on a wide variety of operational issues. Such issues included franchisee openings, the shuttering of particular stores, franchise transfers, and supply planning for the wide assortment of ice cream flavors sold by the stores. These communications occurred regularly (at a minimum, monthly), and the record reveals that on many occasions the communications regarding such operational functions were either

carried out or facilitated by Baskin-Robbins employees situated in Massachusetts.

The short of it is that Baskin-Robbins' performance of these manifold activities — most of which Alpenrose irrefutably knew were taking place in Massachusetts — was vital to the continuation of the franchisor-franchisee relationship. To this extent, Alpenrose deliberately targeted the Massachusetts economy and reasonably should have foreseen that, if a controversy developed, it might be haled into a Massachusetts court. Thus, we conclude that Alpenrose's contacts with Massachusetts crossed the purposeful availment threshold. Put another way, Alpenrose's contacts were scarcely so "random, fortuitous, or attenuated" that it would offend due process to subject Alpenrose to suit in Massachusetts. Id. at 66.

There is one last leg to our journey. We must assess the extent to which the exercise of jurisdiction over Alpenrose is fair and reasonable. This analysis implicates five factors, which we have dubbed the Gestalt factors. See Ticketmaster, 26 F.3d at 209. They comprise "(1) the defendant's burden of appearing [in the forum state], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive

- 21 -

social policies." C.W. Downer, 771 F.3d at 69 (alterations in original) (quoting Ticketmaster, 26 F.3d at 209). Our appraisal of these factors operates on a sliding scale: "the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction." Ticketmaster, 26 F.3d at 210.

To begin, Alpenrose insists that it would be burdensome to defend itself in Massachusetts. But we are not dealing here with relative convenience: our case law makes pellucid that "this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." Hannon v. Beard, 524 F.3d 275, 285 (1st Cir. 2008) (quoting Pritzker, 42 F.3d at 64). Where, as here, parties of substantial means are involved, cross-country travel ordinarily does not qualify as a special or unusual burden. See C.W. Downer, 771 F.3d at 70; BlueTarp Fin., Inc. v. Matrix Constr. Co., 709 F.3d 72, 83 (1st Cir. 2013); see also Pritzker, 42 F.3d at 64 (noting that modern travel "creates no especially ponderous burden for business travelers"). Thus, Alpenrose's burden of appearing in the forum state weighs only modestly in its favor.[6]

---

[6] Citing Ticketmaster, Alpenrose suggests that mere inconvenience to the defendant should "weigh[] heavily in the jurisdictional balance" because such weighting "provides a mechanism through which courts may guard against harassment." 26 F.3d at 211. Here, however, the record is devoid of any indication

- 22 -

The second factor — Massachusetts' interest in adjudicating this dispute — cuts in favor of Baskin-Robbins. As the Supreme Court has explained, "[a] State generally has a 'manifest interest' in providing its resident with a convenient forum for redressing injuries inflicted by out-of-state actors." Burger King, 471 U.S. at 473 (quoting McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957)). That concern obtains here — and to support jurisdiction, Massachusetts' interest need not be exclusive, nor even greater than the interest of other jurisdictions. See Foster-Miller, 46 F.3d at 151 (explaining that "[t]he purpose of the inquiry is not to compare the forum's interest to that of some other jurisdiction, but to determine the extent to which the forum has an interest" (emphasis in original)).

On this point, we reject Alpenrose's argument that Massachusetts has only a "mild" interest because "the dispute concerns [an Agreement] negotiated and executed in California, calling for performance in Washington, Oregon, Idaho, and Montana, and looking to Washington law." This argument fails because it conveniently overlooks the fact that the nature of the franchisor-franchisee relationship necessitated Baskin-Robbins' performance of substantial services on Alpenrose's behalf in Massachusetts.

---

that Baskin-Robbins brought this suit in Massachusetts for the purpose of harassing Alpenrose.

- 23 -

The third Gestalt factor implicates the plaintiff's convenience. Courts regularly cede some deference to the plaintiff's choice of forum, see Sawtelle, 70 F.3d at 1395, and here, Alpenrose concedes that the third factor favors Baskin-Robbins.

The fourth Gestalt factor (the interest of the judicial system in the effective administration of justice) and the fifth Gestalt factor (the interests of the affected sovereigns in promoting substantive social policies) are both neutral. The former is self-evidently a wash. See id.; Ticketmaster, 26 F.3d at 211. Even though Massachusetts courts can effectively administer justice in this dispute, they have no corner on the market.

With respect to the fifth factor, Alpenrose concedes that Massachusetts has a legitimate stake in providing its citizens with a convenient forum for adjudicating disputes. It contends, however, that Washington also has an interest because (on Alpenrose's theory of the case) a Washington statute will determine the compensation owed to it in connection with the expiration of the Agreement. That is true as far as it goes, but it does not take Alpenrose very far. A federal court sitting in Massachusetts is fully capable of applying Washington law. See Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex., 134 S. Ct. 568, 584 (2013). Equally as important, Washington's interest in

the matter does not trump Massachusetts' interest. <u>Cf.</u> <u>Burger</u> <u>King</u>, 471 U.S. at 483 (explaining that "although [the defendant] has argued at some length that Michigan's Franchise Investment Law . . . governs many aspects of the franchise relationship, he has not demonstrated how Michigan's acknowledged interest might possibly render jurisdiction in Florida <u>unconstitutional</u>" (emphasis in original)).

That ends this aspect of the matter. Taken in their entirety, the Gestalt factors are in rough equipoise. Certainly, they do not show that the exercise of jurisdiction over Alpenrose in Massachusetts would be so unfair or unreasonable as to raise constitutional concerns.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, we conclude that Baskin-Robbins' attempted exercise of jurisdiction over Alpenrose in Massachusetts is consistent with due process: the assertion of jurisdiction satisfies both the relatedness and purposeful availment criteria, and the Gestalt factors do not counsel otherwise. Consequently, we reverse the district court's order of dismissal and remand the case for further proceedings consistent with this opinion.[7]

---

[7] We note that the court below has yet to rule on Alpenrose's alternative motion to transfer venue under 28 U.S.C. § 1404(a). That motion raises a different set of issues and is addressed to the district court's sound discretion. <u>See</u> <u>Iragorri</u> v. <u>Int'l</u>

**Reversed and Remanded.**

---

Elevator, Inc., 203 F.3d 8, 12 (1st Cir. 2000).  Hence, we take no view as to its proper resolution.