# United States Court of Appeals
## For the First Circuit

No. 20-1001

CHING-YI LIN,

Plaintiff, Appellant,

v.

TIPRANKS, LTD.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Howard, Chief Judge,
Barron, Circuit Judge,
and Katzmann, Judge.<sup>*</sup>

Jonas A. Jacobson, with whom The Law Offices of Jonas Jacobson was on brief, for appellant.
Efrem Schwalb, with whom Koffsky Schwalb LLC was on brief, for appellee.

November 23, 2021

---

<sup>*</sup> Of the United States Court of International Trade, sitting by designation.

**BARRON, Circuit Judge**. We consider in this appeal a New York resident's assertion that there is personal jurisdiction in Massachusetts over a for-profit Israeli corporation that ranks the performance of U.S. investment analysts. She alleges that the company defamed her in Massachusetts by posting a devastatingly low rating of her professional performance on its publicly available website while she was living in Boston and trying to obtain a job there. She does not allege that the defendant knew that she was in Massachusetts at the time that it posted the allegedly defamatory information. She nonetheless contends that its lack of such knowledge poses no bar to the exercise of personal jurisdiction over it in Massachusetts.

There are significant questions as to when, if ever, the Due Process Clause of the U.S. Constitution's Fourteenth Amendment permits a defamation plaintiff to assert personal jurisdiction over an out-of-forum defendant that operates a for-profit website that trades on assertions about individuals' reputations, absent the defendant knowing the location of the plaintiff at the time that it publishes the allegedly defamatory statement. In this case, however, we conclude that the question of personal jurisdiction may be resolved on the narrow but straightforward ground that the plaintiff has failed on this record to meet her burden to adduce evidence of specific facts sufficient to satisfy the requirements of constitutional due process for the exercise of

such jurisdiction. And, that is because we conclude that she has failed to make the requisite showing that anyone in the forum state saw the low rating of her that grounds her defamation claim. We thus affirm on that limited basis the District Court's ruling that her suit must be dismissed for lack of personal jurisdiction.

## I.

We recount the following facts, which are not in dispute for purposes of this appeal. We then recount the relevant procedural history.

## A.

Ching-Yi Lin is an equity research analyst who advises investors on whether to purchase or sell shares of biotech companies. She received an MBA in finance from Columbia Business School in 2006 and thereafter held multiple positions related to equity research in New York.

In 2015, Lin moved to Massachusetts to work for H.C. Wainwright, which had created a new Boston branch specifically so that she could work from there. Shortly after Lin moved to Boston, however, H.C. Wainwright laid her off as a result of corporate restructuring.

Because Lin had many close friends in Boston, she wanted to stay in the area. She thus sought work nearby, applying to "at least 100 jobs in the Boston area" between November 2015 and August

2016, "including jobs as an equity research analyst, and within the pharmaceutical industry."

Lin applied to many of these jobs through online applications. She also made calls to recruiters and spoke to people in the pharmaceutical sector. During this period, Lin "had a physical interview with Janney Montgomery Scott, and several phone interviews, including with a large Massachusetts company named Philips, and another company known as Stax Consulting."

Despite Lin's credentials and her view that the interviews she had went well, none of these efforts to secure employment in the Boston area panned out. This was unusual, according to Lin, because she had never previously had such difficulty finding employment and the job market for buy-side equity research positions was an employee-friendly one.

Lin moved out of Massachusetts in 2016. In 2018, Lin learned that she was very poorly ranked (4,771 out of 4,832 analysts) on a website that was publicly available for free during the time period that she was seeking employment in Boston.

The website, www.tipranks.com, was run by TipRanks, LTD., an Israeli technology company. TipRanks operates the website exclusively from Israel.

TipRanks aggregates and analyzes publicly available financial data to rank investment analysts, hedge fund managers, financial bloggers, and "corporate insiders." The website's

"About Us" page states that TipRanks was founded to "bring[] the general public the most accurate and accountable financial advice."  The website describes the company as offering a "comprehensive investing tool that allows private investors and day traders to see the measured performance of anyone who provides financial advice."

TipRanks bills itself as the "go-to tool for part-time to professional investors and everyone in the financial world, . . . empower[ing] individual investors by giving them access to the same technology that financial managers have" to give users "the must [sic] needed edge on the market."  TipRanks does so by "aggregat[ing] and analyz[ing] financial data that is publicly available online to provide a data-driven measure of accuracy based on the statistical ability of an expert to generate profits from investment recommendations."

TipRanks uses this information to rank financial analysts based on the performance of their investment recommendations.  These rankings are made available for free on the TipRanks website.

TipRanks also offers subscription-based "premium services" for an annual fee.  This tiered subscription service allows subscribers full access to TipRanks's stock market research tools.  For example, TipRanks's daily analyst ratings, analyst recommendations, "hot stocks," and certain filtering abilities for

searching stocks and experts are only available to those with a paid subscription.

TipRanks is not registered to do business in Massachusetts, has no employees in Massachusetts, and does not maintain an office or own any personal or real property in Massachusetts. According to its chief executive officer, it also does not "derive substantial revenue from business in Massachusetts." There is no information in the record regarding the number of TipRanks subscribers located in Massachusetts, or the number of views the TipRanks website received in the relevant time period (or more generally) from Massachusetts IP addresses or as a whole.

TipRanks did not contact anyone in Massachusetts about Lin's performance in creating her ranking. Like TipRanks's other analyst rankings, it was generated from information that was otherwise publicly available online.

**B.**

After learning about her TipRanks ranking and receiving a job after the ranking depopulated from web searches, Lin, by this time a resident of New York, filed this defamation action under Massachusetts law against TipRanks. In her complaint, Lin alleges that the website's rating, which she assessed was lower than her actual performance, was erroneous and harmed her reputation. The only relief that she requests in her complaint is

damages for lost pay from prospective employers who did not hire her in consequence of the alleged defamatory statement.

Lin originally brought this suit in Massachusetts state court. Some months later, however, TipRanks removed the case to the United States District Court for the District of Massachusetts. See 28 U.S.C. § 1332. Because subject-matter jurisdiction in this case is premised on diversity of citizenship, the District Court was acting "as 'the functional equivalent of a state court sitting in the forum state.'" Kuan Chen v. U.S. Sports Acad., Inc., 956 F.3d 45, 54 (1st Cir. 2020) (quoting Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016)). Thus, Lin had to show that the exercise of personal jurisdiction over TipRanks in Massachusetts would satisfy both the Massachusetts long-arm statute, see Mass. Gen. Laws ch. 223A, § 3, and the Due Process Clause of the U.S. Constitution. Kuan Chen, 956 F.3d at 54; see also SCVNGR, Inc. v. Punchh, Inc., 85 N.E.3d 50, 55-56 (Mass. 2017) (explaining that the Massachusetts long-arm statute is not coextensive with the constitutional limits).

TipRanks moved to dismiss Lin's suit for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) based on both the Massachusetts long-arm statute and federal constitutional due process. Lin filed a motion in opposition and argued in support of that motion that the Massachusetts long-arm statute supported the exercise of personal jurisdiction in this

- 7 -

case. She also contended that the exercise of jurisdiction would comport with the guarantee of due process under the Fourteenth Amendment.

On November 21, 2019, the District Court granted the defendant's motion to dismiss. It first found that the assertion of personal jurisdiction over the defendant fell within § 3(c) of the Massachusetts long-arm statute, which permits the exercise of "personal jurisdiction over a person . . . as to a cause of action in law or equity arising from the person's . . . causing tortious injury by an act or omission in this commonwealth." Mass. Gen. Laws ch. 223A, § 3(c); see also Fed. R. Civ. P. 4(k)(1). It concluded that "because the defamatory material on TipRanks's website was allegedly accessed or 'circulated' in Massachusetts, the act of defamation was committed in Massachusetts within the meaning of section 3(c)." Ching-Yi Lin v. TipRanks, Ltd., No. 1:19-cv-11517, 2019 WL 6211246 (D. Mass. Nov. 21, 2019). The District Court "note[d] that [the long-arm statute] would likely also be satisfied under section 3(d)." Id. at *3 n.3; see Mass. Gen. Laws ch. 223A, § 3(d) (permitting the exercise of personal jurisdiction "as to a cause of action in law or equity arising from a person's . . . causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent

- 8 -

course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth").

Nonetheless, the District Court determined that the assertion of personal jurisdiction over TipRanks did not comport with constitutional due process under the Fourteenth Amendment. A plaintiff seeking to establish personal jurisdiction in conformity with the requirements of the Fourteenth Amendment's Due Process Clause, absent a demonstration that there is general jurisdiction over the defendant, must show that there is specific jurisdiction. Mass. Sch. of L. at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998).[1] To make out that latter showing, the plaintiff must establish that (1) the claim that she is bringing "directly arise[s] out of, or relate[s] to, the defendant's forum-state activities"; (2) the defendant's contacts with the forum state "represent a purposeful availment of the privilege of conducting activities in" that state; and (3) the exercise of jurisdiction is reasonable. See United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1089 (1st Cir. 1992).

The District Court rejected TipRanks's argument to the contrary and held that the "relatedness" prong of the inquiry was satisfied here because Lin's "claim arises out of TipRanks's forum-

---

[1] The plaintiff does not argue that TipRanks is subject to general personal jurisdiction in Massachusetts.

state activity of disseminating the website and the website's content in Massachusetts."  Lin, 2019 WL 6211246, at *4.[2]  But, the District Court held, the "purposeful availment" and "reasonableness" prongs were not met.  Accordingly, the District Court granted TipRanks's motion to dismiss for lack of personal jurisdiction.

Lin timely appealed.

## II.

The District Court dismissed the case for lack of personal jurisdiction without adjudicating jurisdictional facts. Lin did not seek jurisdictional discovery or object to the District Court's use of the "prima facie" method for determining personal jurisdiction.  See Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675-76 (1st Cir. 1992) (describing prima facie standard).  We thus must decide whether Lin has made a prima facie "showing as to every fact required to satisfy 'both the forum's long-arm statute and the due process clause of the Constitution.'"  Id. at 675 (quoting U.S.S. Yachts, Inc. v. Ocean Yachts, Inc., 894 F.2d 9, 11 (1st Cir. 1990)).

In doing so, "we take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and

---

[2] The District Court did not address the question of whether the record supported the conclusion that anyone in the forum state had seen the ranking itself.

construe them in the light most congenial to the plaintiff's jurisdictional claim." Mass. Sch. of L., 142 F.3d at 34. We have cautioned that the "liberality of this approach" does not mean that we must "credit conclusory allegations or draw farfetched inferences." Id. (quoting Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994)). Thus, Lin "cannot rely on conclusory averments but must 'adduce evidence of specific facts.'" Kuan Chen, 956 F.3d at 54 (quoting Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995)). Our review is de novo. See id.

**A.**

As we have noted, the District Court found that the Massachusetts long-arm statute permitted the exercise of personal jurisdiction under § 3(c) -- and likely also under § 3(d) -- of that statute. Those provisions require an act in Massachusetts, Mass. Gen. Laws ch. 223A, § 3(c), or an injury in Massachusetts, id. § 3(d).

The parties vigorously dispute on appeal whether those requirements are met here. That dispute implicates questions about what the record shows in terms of whether the allegedly defamatory ranking was seen by someone in Massachusetts such that there was an injury -- reputational harm -- in the state and thus that the act of defamation occurred "in" the state.

But, we need not address this dispute about the record in connection with the question of whether the District Court erred in finding the Massachusetts long-arm statute satisfied, although we will return to it in connection with our resolution of the due process inquiry.  The reason that we need not do so is that Lin separately contends on appeal that she has satisfied the distinct requirements of § 3(a) of the state's long-arm statute.

Section 3(a) provides for the exercise of "personal jurisdiction over a person . . . as to a cause of action . . . arising from the person's . . . transacting any business in this commonwealth."  Id. § 3(a).  This section does not itself necessarily implicate the question of whether anyone in Massachusetts saw the TipRanks posting that is alleged to have caused Lin's injury that underlies the parties' dispute over § 3(c) and § 3(d) of the long-arm statute.  That is because the question of whether the maintenance of the website in Massachusetts constitutes "transacting any business" would not seem to require determining whether the act of defamation itself can be said to have occurred "in" Massachusetts or caused an injury in the state.

Lin's invocation of § 3(a) to show that she can satisfy the requirements of the Massachusetts long-arm statute is significant for present purposes because the District Court, while acknowledging that Lin had argued that § 3(a) was satisfied, did not address the merits of that contention.  TipRanks also did not

address the requirements of § 3(a) in its filings in the District Court or in its briefing to us.

Thus, rather than engage the complicated questions regarding how § 3(a) applies in this context without the aid of either fully adversarial briefing or a lower court decision, we proceed on the understanding that Lin is right that, given § 3(a), the long-arm statute poses no bar to the exercise of personal jurisdiction over TipRanks here. We emphasize that our decision to proceed in this manner causes no prejudice to TipRanks. As we will next explain, even assuming that TipRanks's business activity in Massachusetts suffices to satisfy the requirements of § 3(a) of that state's long-arm statue as Lin contends, our recent decision in Scottsdale Capital Advisors Corp. v. The Deal, LLC, 887 F.3d 17 (1st Cir. 2018), leads us to conclude that we must affirm the District Court's ruling that the exercise of personal jurisdiction over TipRanks on these claims does not comport with due process, albeit for reasons that differ in focus from those on which the District Court relied in dismissing the case on due process grounds. And that is because, as we will also explain, the record fails to show that anyone in Massachusetts saw the allegedly defamatory statement in question, which in turn, under Scottsdale, requires that we conclude that the relatedness prong of the due process inquiry into personal jurisdiction is not satisfied, notwithstanding the District Court's ruling to the contrary.

**B.**

Scottsdale is relevant to the constitutional issue concerning personal jurisdiction here for the following reasons. Like this case, it involved a question of personal jurisdiction in a case involving a defamation claim that was brought in federal district court against an out-of-forum defendant. Id. at 18-19. Moreover, like in this case, the question of personal jurisdiction there centered on whether the Due Process Clause permitted the exercise of specific jurisdiction over the defendant, there being no basis for finding general jurisdiction. Id. at 20. Thus, the question was whether the plaintiff could satisfy the requirements of relatedness, purposeful availment, and reasonableness. See id. Finally, the due process inquiry in Scottsdale began and ended with the relatedness requirement, for reasons that lead us to conclude that the same inquiry must begin and end with that requirement in this case as well.

To see why, it first helps to provide some more detail about Scottsdale itself. There, the suit was brought in New Hampshire by an Arizona corporation and one of its officers concerning allegedly defamatory articles that the defendant, "The Deal," had posted to a subscriber-only web portal and attached to email newsletters sent to subscribers. See id. at 18-19. With respect to the relatedness requirement, Scottsdale explained that, given the nature of the legal claim at issue there, the relatedness

- 14 -

showing depended on whether the evidence sufficed to show a causal connection between the claimed injury -- reputational harm -- and the defendant's forum-state activities.  Id. at 21.

That question was a substantial one in that case because the only forum-state activity identified was the defendant's maintenance of a subscriber-only website in the forum state and its solicitation of one subscriber in the state.  Id. at 19.  To be sure, that one subscriber was an institutional subscriber -- a college in the forum state -- and so through that institutional subscription, members of the college community had signed up to receive access to The Deal's web portal and to receive email newsletters from The Deal.  Id. at 18-19.  But, the question remained whether anyone using that subscription had accessed the material in question, as, we explained, without a showing that any of the individuals using the school's institutional subscription had accessed the articles in question, the plaintiffs could not demonstrate the "nexus between the claims and the defendants' forum-based activities [that] the relatedness prong of the jurisdictional analysis requires."  Id. at 22.  In support of that conclusion, we explained that "to assess relatedness [for claims sounding in tort] we 'look to whether the plaintiff has established cause in fact (i.e., the injury would not have occurred "but for" the defendant's forum-state activity) and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action).'"

Id. at 20-21 (quoting Mass. Sch. of L., 142 F.3d at 35). We further explained that under New Hampshire law, which looks to the Restatement (Second) of Torts for the elements of defamation, reputational harm -- and thus liability for defamation -- only occurs where the defamatory material is read and understood by a third party. Id. at 21. Accordingly, we concluded that if no one using the forum-state college's institutional subscription saw the articles, the plaintiffs could not establish cause in fact or legal cause because their "reputation would not differ had [the college] not subscribed to The Deal." Id. at 22.[3]

Given the nature of the underlying legal claim in this case, the relatedness inquiry here, as in Scottsdale, concerns "whether the plaintiff has established cause in fact (i.e., the injury would not have occurred 'but for' the defendant's forum-

---

[3] Jurisdictional discovery in that case had narrowed the number of potential readers of the allegedly defamatory materials in that case to only two -- the number of people who had used the college's institutional subscription to sign up for email newsletters -- because analytic tools used in that discovery showed that no one using the forum-state college's institutional subscription had viewed the articles where they were available on The Deal's web portal. Scottsdale, 887 F.3d at 19.

To the extent Scottsdale is arguably distinguishable because there had been jurisdictional discovery that conclusively established the number of potential readers, the plaintiff here made no request to conduct such discovery. See Boit, 967 F.2d at 681 ("Having failed to request any additional discovery to provide evidentiary support for their jurisdictional allegations, the [plaintiffs] cannot now complain that [the defendant] alone has knowledge of the relevant jurisdictional facts.").

state activity) and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action)." See id. at 20-21 (quoting Mass. Sch. of L., 142 F.3d at 35). Defamation under Massachusetts law, like the New Hampshire cause of action at issue in Scottsdale, similarly follows the Second Restatement in requiring that the defendant communicate the defamatory statement to a third party. See White v. Blue Cross & Blue Shield of Mass., Inc., 809 N.E.2d 1034, 1036 (Mass. 2004). The result is that, per Scottsdale, Lin's attempt to satisfy the relatedness requirement fails if she cannot show that her TipRanks rating was seen by anyone in Massachusetts because then she cannot establish the nexus to the claim that relatedness requires. See 887 F.3d at 22.

Before addressing whether Lin has done what she must to make that showing at this stage of the litigation, however, we do pause to acknowledge what we noted above -- TipRanks, as appellee, does not dispute the District Court's conclusion that there was no relatedness problem in this case. TipRanks trains its focus in this appeal on defending the District Court's independent conclusion that Lin failed to satisfy the purposeful availment and reasonableness prongs of the due process inquiry and that her bid to establish personal jurisdiction fails on that basis.

Notably, though, in opting for that focus, TipRanks did not -- and does not -- concede that a tort occurred in Massachusetts or that someone in Massachusetts saw the ranking of

- 17 -

Lin.  Instead, TipRanks disputed below -- and disputes to us -- that the evidence shows that anyone in Massachusetts saw the ranking.  Scottsdale makes clear, moreover, that, insofar as TipRanks is right on that score, this evidentiary gap gives rise to a relatedness problem.  See id. at 21-22.

We, of course, may affirm the District Court's ruling on any ground manifest in the record.  See Kuan Chen, 956 F.3d at 54. Thus, because we conclude that TipRanks's assertions about the factual deficiencies in Lin's complaint and supplemental filings concerning whether anyone in Massachusetts viewed Lin's rating on its website are well taken, we conclude that the most prudent course is to affirm the District Court's dismissal on this relatedness ground.  This approach, as we will explain, accords with our precedent in this developing area of the law of personal jurisdiction and thus obviates our need to address the more novel constitutional questions concerning purposeful availment and reasonableness in the context of internet-based defamation claims that we would otherwise need to confront to decide whether to affirm the District Court.  With that framing of the assessment of the record that follows, we now turn to what the record shows here with respect to relatedness.

### C.

Scottsdale does make clear that "circumstantial evidence . . . might be sufficient to raise a presumption" that

purportedly defamatory information was seen by an individual in the forum state. 887 F.3d at 21-22. So, the fact that Lin's pleadings do not assert any facts that directly show that someone in Massachusetts saw her rating on www.tipranks.com -- let alone relied on it to her detriment -- is not necessarily a problem for her.

It is also true that, in Scottsdale, the purportedly defamatory material was available on a subscription-only basis. See id. at 18-19. That is not so here. The portion of the website in question is publicly available and so may be accessed by anyone perusing the internet; no subscription is needed to access it or the allegedly defamatory material that it contained.

Lin has not argued at any point, however, that the mere fact that TipRanks's ranking of her was freely available in Massachusetts establishes that someone in the state must have seen the specific ranking of her about which she complains. In addressing TipRanks's challenge to relatedness below, she did point to cases involving trademark infringement claims concerning allegedly infringing websites. See Morphotrust USA, LLC v. Identrix, LLC, No. 16-cv-10074, 2016 WL 3512131, at *5 (D. Mass. June 21, 2016) ("Courts have repeatedly found the relatedness prong 'easily satisfied' where the alleged trademark infringement arose out of the publication of a website in Massachusetts that allegedly caused harm to a Massachusetts plaintiff."); N. Light Tech. v. N.

Lights Club, 97 F. Supp. 2d 96, 106 (D. Mass. 2000). But, the domain-name context there hardly establishes that if a website is made widely available to internet users -- including users in the forum state -- then we must presume that people in the forum state saw a particular part of that website in the manner that relatedness in the defamation context requires. Nor has Lin argued that it does.

We see no reason to question that choice. Although there is no information in the record about how many views the TipRanks site receives, it certainly seems plausible to infer that someone in Massachusetts visited www.tipranks.com during the relevant time, just as it would seem plausible that someone in the state would have visited another popular website (e.g., YouTube). The question for present purposes, though, is whether someone in Massachusetts saw Lin's particular ranking on the TipRanks website, much as the question in a defamation action against someone who made an allegedly defamatory statement and posted it to YouTube would be whether anyone saw the particular YouTube video that contained that statement.

By Lin's own account, the people most likely to have seen the ranking in question here were not in fact the people who visited the site directly. They were potential employers who came across the site's ranking of Lin in the course of searching for her on Google.

To that point, Lin develops her case for drawing the inference that someone in Massachusetts saw the ranking solely by focusing on the reasonableness of the inference that the potential employers to whom she applied saw it. And, that is precisely because, as Lin emphasizes, that ranking placed her in the bottom seventy of the listing of nearly 5,000 analysts ranked on the site, such that, by her account, merely accessing the website would not necessarily lead one to come across the ranking of her that grounds her defamation claim, given how low down the listing of rankings on the website hers appeared.

We find this feature of the case a salient one. If the people Lin herself says were most likely to have seen the allegedly defamatory material did not see it, we decline to infer that those who were even less likely than them to have seen it saw it nonetheless, absent anything in the record that indicates a reason for our doing so. See Ayasli v. Korkmaz, No. 19-cv-183-JL, 2020 WL 4287923, at *8 (D.N.H. July 27, 2020) (finding plaintiff's declaration that "the Turkish newspapers that published the defamatory articles . . . make[] [their] content freely available online and [are] widely read by people of Turkish descent in New Hampshire" insufficient to find relatedness where plaintiff "offer[ed] no evidence that anyone in New Hampshire (besides him) ha[d] seen or read the allegedly defamatory articles themselves" (internal quotation marks omitted)), reconsideration granted on

- 21 -

other grounds, 2020 WL 5879341 (D.N.H. Oct. 2, 2020); cf. Brown v. Dash, No. 20-10980-FDS, 2020 WL 6806433, at *9 (D. Mass. Nov. 18, 2020) ("[A]lthough there is no proof (or, indeed, allegation) that Massachusetts residents apprehended the defamatory content, the hundreds of thousands of views of defendants' [allegedly defamatory] videos and posts are likely sufficient circumstantial evidence that at least some of the defamatory content [was apprehended in] Massachusetts." (emphasis added)); de Laire v. Voris, No. 21-cv-131-JD, 2021 WL 1227087, at *3-4, 4 n.7 (D.N.H. Apr. 1, 2021) (noting a presumption of publication that may arise when "defamatory materials are publicly available to a sufficient number of people" but noting in finding the presumption satisfied that the publicly available website had 288 contributors in the forum state, that the defendants did not dispute that the allegedly defamatory materials were viewed and understood in the forum state, and that the plaintiff had received "numerous phone calls and emails from [forum-state] parishioners" which the defendants did not dispute were a result of the web postings).

Thus, the crucial question for relatedness purposes turns on what the record shows in terms of permitting the inference that any prospective employer to whom she applied did look at the ranking. For, if the record does not include facts sufficient to support that inference, then we do not see how under Scottsdale

Lin can satisfy the relatedness requirement on this record.  We turn, then, to that question.

**D.**

Lin contends that, when all reasonable inferences are drawn in her favor -- as they must be -- the fact that she "was a highly educated and highly valued analyst who applied to, and interviewed with, numerous Boston and Cambridge based employers for over a year without being hired" but then "was hired less than a month after TipRanks removed the inaccurate profile posted on its website" is sufficient to establish that her potential employers viewed the allegedly defamatory TipRanks posting.  In building the inferential case on which the relatedness inquiry in this case hinges, though, Lin does not argue that employers would have been likely to use TipRanks itself to aid in its hiring process.  Indeed, the TipRanks website makes clear that its intended audience is individual investors, not employers.  Nor does anything in the record suggest that TipRanks was or even was intended to be used as a tool for companies considering hiring analysts.  Lin argues instead that it is fair to infer that prospective employers to whom she applied would have come across the low ranking of her on the website in the course of searching for her on Google.  She identifies as support for this contention that "Tip Ranks results appeared high on the 'Google[]' front page"

when searching for her and were "amongst the first several hits[] when searching [Google] for 'Ching-Yi Lin' and 'Analyst.'"

The premise for this contention is, necessarily, that at least one among the prospective employers to whom Lin applied conducted the search that she posits must have been undertaken. But, we do not see what basis we have for finding that premise supported here, whether our focus is on those prospective employers to whom she applied who did not even call her in for an interview or the still smaller subset of prospective employers to whom she applied who did interview her but then did not go on to make her an offer.

For starters, there is nothing in the record that suggests that conducting an internet search for all applicants -- or even all reasonably strong ones -- in advance of calling applicants in for interviews is anything like a routine practice in the industries in which Lin was applying. Thus, while "experience and common sense," Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), suggest that in 2015 and 2016 some employers were Googling some applicants, it strikes us as too speculative to infer from this record that the group of employers to whom Lin applied

searched for her on Google before even interviewing her and then came across her low ranking on the website.[4]

In fact, from Lin's account, we know only that a number of the potential employers at issue were not seeking specifically to hire an investment analyst. And, among the jobs Lin sought during the relevant time were a number of high-ranking positions, such as vice president of a biotechnology company. Thus, even though we draw reasonable inferences in Lin's favor, the evidence in the record here does not require us to presume that Lin was such a qualified candidate for these posts that the Google search she hypothesizes must have been undertaken pre-interview.

Insofar as Lin asks us to infer from the fact that she received no offers of employment while the website displayed the low ranking that the Massachusetts employers to whom she applied saw that ranking in the course of deciding whether to interview her, we also cannot see how we may do so. Lin has alleged that she was a strong applicant and that she was seeking a job in an "employee-friendly job market," and we accept these assertions as true. But, there are myriad reasons why an individual might not receive an interview. Moreover, Lin did receive some interviews while the problematic rating on www.tipranks.com was on display.

---

[4] We do not address whether a complaint that sufficiently alleged an employer practice of pre-screening applicants on Google would satisfy the relatedness requirement.

- 25 -

Thus, the record suggests that if the ranking was the barrier to entry for her, it was far from an absolute one. That being so, we do not see what non-speculative basis there is for concluding that the ranking proved to be a barrier only for those employers -- or a subset of them -- to which she applied but that did not seek to interview her, at least when there is no basis for presuming that prospective employers generally would have done the search described before even inviting her to interview.

To be sure, Lin does point to evidence in the record that she was interviewed by some of the prospective employers to whom she applied while the low ranking appeared on the TipRanks website. And she contends that the fact that these employers did not make her an offer even though they had interviewed her supports the inference she would have us draw about an employer having seen the allegedly defamatory ranking, at least in the wake of the interview as the employer decided whether to extend an offer. But, here, too, we are not persuaded.

We do not dispute that it is possible that an employer would have done a Google search of Lin's name after having called her in while it was deciding whether to make her an offer. The number of interviews that the record shows that Lin was granted in the relevant time span is too small, however, for us to infer that one of those prospective employers in fact performed the particular

Google search that would have led it to the TipRanks ranking of her.

Nor can the fact that these interviews did not result in Lin being offered a job itself support that inference, especially given the limited number of interviews involved. We emphasize in this respect the fact that Lin has offered little in the way of specific facts about the interviews that she received.

The record indicates that she had one physical interview and several phone interviews. Even if we assume that all of these interviews were in Massachusetts or with Massachusetts-based companies, which is not itself clear from the record, and that the companies shared Lin's perception that the interviews "had gone well," we find this sample size too small, given the contingencies, to constitute circumstantial evidence sufficient to infer that the employers' failure to follow up with Lin can be explained by their having viewed her TipRanks rating. See Scottsdale, 887 F.3d at 22 (considering whether plaintiffs had adequately established that allegedly defamatory material in an email attachment had been accessed by anyone in the forum state and concluding that, where the evidence showed that only two people in the forum state had received an email containing the attachment, the number of recipients was too small to "generate on its own a reasonable assumption that at least one must have opened the attachment"); see also id. (distinguishing the facts in Keeton v. Hustler Mag.,

Inc., 465 U.S. 770 (1984), which involved an article in a magazine delivered to over 10,000 paying customers in the forum state, and noting that even if many of them did not read the article, "it seems quite certain that at least some of the 10,000-plus purchasers read the articles"); cf. Boit, 967 F.2d at 680 (addressing plaintiffs' satisfaction of the prima facie personal jurisdiction showing where the allegation that defendant "Gar-Tec sold [a] hot air gun to Brookstone directly" was a "cornerstone" of that jurisdictional showing, and finding that "the inferred 'facts' that the hot air gun was once in Gar-Tec's possession and later came into Brookstone's possession do not establish that Gar-Tec sold the gun wholesale directly to Brookstone" because the record "no more supports an inference that Gar-Tec sold the hot air gun directly to Brookstone than it does an inference that Gar-Tec sold [it] to another company without knowledge that it might sell to Brookstone").

It is true that in Scottsdale it was clear that the relevant pool of potential readers of the allegedly defamatory article was both certain -- in light of what jurisdictional discovery revealed -- and smaller than our sample size here, in that case numbering only two. See 887 F.3d at 19-21. But, in Scottsdale, the question was whether we could presume that either of the two individuals in question had opened an article that was included as an email attachment in an email newsletter that they

had signed up to receive.  See id. at 21-22.  Despite the fact that signing up to receive email newsletters might suggest interest in the content of attachments sent in those newsletters, we found that because "[i]ndividuals often receive many emails every day, attachments to which may well go unopened," we could not "assum[e] that at least one recipient must have opened the attachment."  Id. Here, we are asked to assume, based on a handful of interviews, that someone who was not the target audience of the website -- a potential employer -- conducted a Google search for one applicant out of an applicant pool of an unknown size.  We cannot see how that assumption is any more warranted than the one we declined to make in Scottsdale.

Finally, the record does show that Lin received an offer after the TipRanks rating depopulated from a Google search.  Lin contends that this aspect of the record supports us drawing the inference about prospective employer conduct she contends is reasonably drawn.  We do not agree.

We know little about that offer from the record.  For example, we do not know what the position she was offered was and how it compared to positions she had applied for during the relevant time frame, or how many other jobs she applied to after the ranking depopulated for which she did not get offers.  Nor is there evidence in the record or an allegation from Lin that she steadily applied for jobs between August 2016 and her hiring in

2018, which makes it particularly difficult to conclude that the timing of the eventual offer is significant. And, even if we assume that she did continue applying for jobs through that period, the fact that she received a job offer within a month of the ranking depopulating from Google is not sufficient to infer that employers had previously been conducting Google searches prompting them to see and rely on the purportedly defamatory material. Thus, we do not see how the fact of her having been hired when she was is sufficient on its own -- or even when considered with the other aspects of the record just reviewed -- to permit the inference that Massachusetts employers were looking at the TipRanks profile.

**E.**

In sum, as in Scottsdale, we are left to conclude that "nothing in the record indicates that [reputational harm] arose from [the defendant's] contacts with plaintiff['s] chosen forum." 887 F.3d at 22. That is no less fatal to the showing of relatedness here than it was there.

**III.**

For the foregoing reasons, the judgment dismissing Lin's complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) is affirmed.